STATE of Wisconsin, Plaintiff-Respondent,

v.

Bernell L. Ross, Sr., Defendant-Appellant.†

Court of Appeals

*No. 02–0121–CR. Submitted on briefs November 5, 2002.—
Decided January 22, 2003.*

2003 WI App 27

(Also reported in 659 N.W.2d 122.)

† Petition to review denied 6-12-03.

292

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Andrew Mishlove* of *Law Offices of Andrew Mishlove*, Milwaukee.

■■■■■■■■■■■■■■■■■■■■

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general and *Edwin J. Hughes*, assistant attorney general.

Before Wedemeyer, P.J., Schudson and Curley, JJ.

¶ 1. WEDEMEYER, P.J. Bernell L. Ross, Sr. appeals from a judgment of conviction after a jury found him guilty of violating Wisconsin's Organized Crime Control Act (WOCCA), making a fraudulent offer and sale of securities, selling unregistered securities, making misleading filings in regard to securities, and violating the May 2, 1997 securities law order by offering and selling securities after that date, all as party to a crime, contrary to WIS. STAT. §§ 946.82–83, 551.41(2), 551.21(1), 551.54, 551.58(1) and 939.05 (1997–98).[1] He also challenges the trial court's restitution award.

¶ 2. Ross contends that he is entitled to a new trial because the trial court erred when it: (1) failed to accept a *Batson*[2] challenge to the State's exercise of its peremptory strikes; (2) declined to give the jury an instruction relative to his "advice of counsel" theory of defense; (3) erroneously exercised its discretion with respect to three evidentiary rulings; and (4) denied a motion for a mistrial after it chastised him for his courtroom deportment. He also claims the trial court erred when it ordered him to pay restitution of no more that $587,100 to the victims of his crimes. For the reasons stated hereafter, we affirm the judgment of conviction, the restitution order, and the trial court's rulings in every respect.

---

[1] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

[2] *See Batson v. Kentucky*, 476 U.S. 79 (1986).

## BACKGROUND

¶ 3. Ross had a dream, a dream of some magnitude. Unfortunately, it died aborning and, in the aftermath, hundreds of investors lost thousands of dollars. In 1994, Ross conceived of a way for African-American entrepreneurs to gain entry into the telecommunications world. After discussing the concept with many of his acquaintances, Ross, together with three Milwaukee resident-associates, Ura Dozier, Michael Ewing, and Kenneth Mosely, agreed to form a business enterprise called Intra Kommunity Kommunications of Wisconsin (IKKW). It was intended to be incorporated with each person owning 25% of the stock. Articles of Incorporation, however, were never filed with the State of Wisconsin. In March 1996, after the enactment of the Federal Communications Act of 1996, IKKW applied to the Wisconsin Public Service Commission (PSC) for certification as an alternate telecommunication utility. The PSC granted the certification to IKKW in July 1996. It authorized IKKW to offer local exchange telephone service in competition with Ameritech and obligated Ameritech to sell services to IKKW on a wholesale basis, which IKKW could then resell to its customers.

¶ 4. Meanwhile, in March 1996, Ross, who was then living in Baltimore, Maryland, incorporated a company there called Kommunity Kommunications of America, Inc. The other three investors from Wisconsin were not involved in the Maryland corporation. In July 1996, he changed the name of this corporation to Intra Community Communications, Inc. (ICCI).

¶ 5. On March 28, 1997, Ross incorporated a company called Intra Community Communications of Wisconsin, Inc. (ICCW) in Wisconsin. The initial directors of the company were Ross and Karl Nichols. On

March 20, 1997, Ross requested that the PSC transfer the IKKW certification to ICCW. This request was without the knowledge of the other three partners of IKKW. In his application for transfer of certification, Ross represented to the PSC that "the name 'Intra Kommunity Kommunications of Wisconsin, Inc.' ('IKK') has been changed to 'Intra Community Communications of Wisconsin, Inc.' ('ICC') . . . ICC is the identical corporation to IKK having identical officers and Board of Directors . . . ."[3] This representation was not true. ICCW had not been incorporated when the application for transfer was made. The three other original partners of IKKW still believed they had an equal ownership share in ICCW. The PSC granted the transfer of certification to ICCW.[4]

¶ 6. Under Ross's business plan, the Maryland corporation, ICCI, would be the parent corporation for a number of separate "ICC" corporations to be established in different states to provide telephone service in those states, thereby creating a large telecommunications network.

¶ 7. During February 1997, Ross commenced soliciting investments in ICCI from Wisconsin residents at the price of $1 per share. On two separate occasions, when Ross was soliciting stock purchases, he was advised by Fred Reed, a securities examiner investigator for the Wisconsin Department of Financial Institutions (DFI), to be sure the securities were registered before they were sold. Ross advised Reed that the

---

[3] In his letter to the PSC, Ross used the initials "IKK" instead of "IKKW" and "ICC" instead of "ICCW."

[4] The record refers to the parent corporation in Maryland as "ICC" and "ICCI." For the purposes of this opinion and to serve consistency, we shall henceforth refer to it as "ICCI."

securities had been registered under the name of IKK. This proved not to be true. Reed called Ross at his corporate office in Baltimore to inform him that no registration existed. Ross insisted that the securities were registered. Reed then sent the appropriate forms to Ross's attorney, Nathan Gundy III, for registration of the securities. Reed informed Gundy that ICCI could not sell securities in Wisconsin unless they were registered or otherwise exempt from registration. Reed further informed him that it did not appear that the securities would be exempt. Ross instructed his attorney to try to obtain an exemption from registration because he did not want to pay the projected attorney's fees for securing registration. ICCI filed a registration application on April 2, 1997. DFI deemed the submission inadequate.

¶ 8. In the meantime, Ross continued to solicit investments in ICCI from potential Milwaukee investors. As part of his efforts, he represented that the securities were registered, and that as of April 25, 1997, he would stop selling the stock at $1 per share. After that date, shares would only be available at $10 per share.

¶ 9. On May 2, 1997, in response to these actions, DFI issued a formal order of "Prohibition and Revocation" (a stop order), prohibiting ICCI from making any further offers or sales of securities. On May 5, Ross's attorney responded to the stop order, stating that ICCI would not solicit or sell any securities in Wisconsin until the stock was registered. Gundy further informed DFI that ICCI was attempting to provide rescission notices to its current shareholders.

¶ 10. Notwithstanding the stop order, Ross began negotiating with his recently hired assistant, Sharon Cooper, for the sale of 50.1% of the shares of ICCI. An

agreement for the sale was consummated on November 19, 1997, whereby Cooper paid Ross $55,000 on November 25, 1997.

¶ 11. ICCI experienced start-up and operational difficulties and became delinquent in its payment to Ameritech for the cost of telephone services. In September 1997, ICCI filed for protection under Chapter 11 of the Bankruptcy Code. To ensure the continuation of telephone services, Ameritech requested the payment of $471,000. When ICCI was unable to meet this requirement, the bankruptcy court allowed Ameritech to disconnect ICCI's customers as of October 14, 1997. This event spelled the end of Ross's wonderful dream.

¶ 12. In sum, $504,000 was invested by almost 1000 shareholders, most of whom were from Wisconsin. The venture was a total loss. As a result, Ross was charged with the crimes noted earlier in this opinion. The case was tried to a jury and he was convicted. He now appeals.

## ANALYSIS

¶ 13. Ross raises seven issues of claimed trial court error. We shall address each in the order that we deem appropriate.

*A. Batson Challenge.*

¶ 14. Ross first claims he is entitled to a new trial because the State exercised its peremptory strikes in a racially discriminatory manner, contrary to *Batson v. Kentucky*, 476 U.S. 79 (1986).

¶ 15. In a challenge to a *Batson* ruling, we review the trial court's determination as to whether the State had a discriminatory intent as a finding of historical

fact, which we shall not disturb unless clearly erroneous. *State v. Gregory*, 2001 WI App 107, ¶ 5, 244 Wis. 2d 65, 630 N.W.2d 711. The methodology we employ is a three-step process that may involve shifting burdens, depending upon the evidence presented. In the first step, the accused must make a prima facie showing that the State acted with discriminatory intent by establishing that it exercised peremptory strikes on the basis of race, gender, or any other prohibited category. *State v. Jagodinsky*, 209 Wis. 2d 577, 580, 563 N.W.2d 188 (Ct. App. 1997). The trial court may consider all relevant factors in determining whether the accused made a prima facie case. *State v. Walker*, 154 Wis. 2d 158, 173–74, 453 N.W.2d 127 (1990).

¶ 16. If the accused successfully crosses this threshold, the burden shifts to the State to set forth grounds to refute the inference of discriminatory intent. *Jagodinsky*, 209 Wis. 2d at 580. This necessitates the State articulating a neutral explanation as it relates to the particular case being tried. *Gregory*, 2001 WI App 107 at ¶ 8. If the State accomplishes this task, the process moves to the third stage, where the trial court must "weigh the credibility of the testimony and determine whether purposeful discrimination has been established." *Id.* In this exercise, the accused may show that the explanation of the State is sheer pretext for the forbidden category discrimination. *Walker*, 154 Wis. 2d at 176 n.11.

¶ 17. Because of the complexities of this case, the trial court anticipated that it would take two weeks to try, and informed the prospective jurors of this expectation. Several jurors claimed that the anticipated length of the trial would create hardships in their lives. For this reason, the trial court, prior to the exercise of

any peremptory challenges, conferred with counsel on the record as to the hardship issue. Seventeen of the prospective jurors claimed hardship. The State was willing to excuse, for cause, all of the potential jurors who claimed a hardship. Ross, however, was not so willing. As the record reflects, the trial court then examined the nature of each hardship claim. If either counsel objected to striking a juror for cause based upon hardship, the court allowed the juror to remain on the panel to be subject to peremptory strikes. After this procedure, seven of the seventeen who claimed hardship remained on the panel, and were subject to the peremptory process. The trial court decided to have three alternates, so that the final panel consisted of fifteen members. Each party had seven peremptory strikes. After the peremptory strikes were taken, four African-Americans remained on the panel. The State used its challenges to strike three African-Americans, three Caucasians and one Hispanic-American. The defense used all of its seven strikes against Caucasians.

¶ 18. Ross challenges the State's peremptory strikes of four jurors: three African-Americans Derek Chappell, Edna Hale and Bertha Nichols, and one HispanicLuis Hernandez. Both Chappell, a male, and Hale, a female, claimed hardship, but Ross was unwilling to excuse them for cause. The State stated it struck these individuals based on their hardship claims. Likewise, the State explained it had struck a Caucasian male for the same reason. The State explained that it struck Nichols because she was not attentive during the selection process and actually "dozed off" during the voir dire. The State struck Hernandez because "it wasn't clear that he would have been as good a juror as some of the others that were available and left on the

jury to us." The State also explained that it was "getting . . . friendlier faces, more open body language, more attention and more responsive visual impressions from those other jurors."

¶ 19. The trial court concluded that Ross had failed to make a prima facie showing of an impermissible reliance on race. The trial court declared:

> And so what we have is four blacks being left on the panel after [the prosecutor's] strikes. She uses roughly half of her strikes — three strikes for African-Americans and a fourth one for a Hispanic person — and she uses three others of her strikes for white people, and I would note that she struck a white person with a hardship as she did strike two black people with a hardship [sic]. And I would additionally note that in terms of all of these findings in terms of whether the defense has made a *prima facie* showing of impermissible reliance on race, it is noteworthy in this case that the victim[s] in this case w[ere] black, and the defendant in this case is black, and I think there's great merit to [the prosecutor's] argument that it would be illogical — in fact, ludicrous — for the State to have wanted to exclude people who were black from the jury. There is no strategy, no rationale, that would make any sense for the State to do that if, in fact, the whole point of voir dire and jury selection is to get people on the panel who are open-minded, and considering that the State was relying on the testimony of almost exclusively black people, it would [be] ludicrous for [the prosecutor] to want to strike black people, and I would note that, as I've indicated, she didn't strike only black people, and I do not find, based on this record, that the defense has made a *prima facie* showing of any impermissible basis for the State's strikes.

¶ 20. Thus, the trial court made findings, based upon the overall record, which reasonably support the conclusion that the strikes were not made in any

307

forbidden discriminatory way. The findings are not clearly erroneous and the conclusion that a prima facie case was not shown has ample support in the record.

¶ 21. The trial court did not complete its findings when it reached the conclusion that Ross had not demonstrated a prima facie case. Rather, it further examined the specific reasons proffered by the State to form the basis for its strikes of the four venire-persons, and found that they were clearly race-neutral. From our review of the record, we agree there was absolutely no taint of an impermissible reliance on race or age. The trial court's review of the record was painstakingly thorough and circumspect. It did not err and, as a result, Ross's first claim of error fails.

*B. Advice of Counsel Instruction.*

¶ 22. Ross claims that the trial court erred when it denied his request to submit an "advice of counsel" instruction to the jury. Ross requested an instruction directing the jury to find him not guilty on all six counts if it found that he was following the advice of his attorney. Ross asserts that his reliance on the advice of his counsel negates the element of willfulness contained in all of the charges. The trial court concluded that the evidence was insufficient to allow the jury to determine that the advice-of-counsel test had been satisfied.

¶ 23. Granting the request of an accused for a specific instruction is required where there is any foundation in the evidence for the giving of such instruction, even though the evidence may be weak, insufficient, inconsistent or of doubtful credibility. In determining whether the requested instruction is required, we must not weigh the evidence or look to the

totality of the evidence; rather, we must view the evidence in the light most favorable to the accused. *See State v. Giminski*, 2001 WI App 211, ¶ 8, 247 Wis. 2d 750, 634 N.W.2d 604. Whether the evidence, viewed in the light most favorable to Ross, supplies a sufficient basis to include the proposed instruction is a question of law, and will be reviewed independently. *Id.* at ¶ 11.

¶ 24. To warrant an advice-of-counsel theory of defense instruction, both parties agree that Ross was required to show that:

> (1) before taking action, (2) he in good faith sought the advice of an attorney whom he considered competent, (3) for the purpose of securing advice on the lawfulness of his possible future conduct, (4) and made a full and accurate report to his attorney of all material facts which the defendant knew, and (5) then acted strictly in accordance with the advice of his attorney who had been given a full report.

*United States v. Cheek*, 3 F.3d 1057, 1061 (7th Cir. 1993) (citation omitted). For two reasons, we reject this claim of error.

¶ 25. The trial court correctly concluded that the evidence was insufficient to allow the jury to determine that the *Cheek* test had been met. Thus, it did not have to apply the *Cheek* test. Ross never established the "willfulness" element in *Cheek*, which can be distinguished from the "willfulness" element in Wis. STAT. § 551.58 and WOCCA, because the two terms require different levels of proof. Upon examination, any commonality between the two elements disappears.

¶ 26. In *Cheek*, the "willfulness" element in a prosecution for willfully failing to file federal tax returns was defined as the " 'voluntary and intentional

violation of a known legal duty or purposeful omission to do what the law requires.' " *Cheek*, 3 F.3d at 1062 (citation omitted).

¶ 27. Here, under neither the securities fraud statutes nor WOCCA is the State required to prove that the accused acted with intent to defraud or with knowledge that the law was violated. All that the State is required to prove is that the accused acted intentionally in the sense that he or she was aware of the act that he or she was performing. *See* generally *State v. Mueller*, 201 Wis. 2d 121, 549 N.W.2d 455 (Ct. App. 1996). Because Ross's specific state of mind was not relevant to any of the elements of the crimes with which he had been charged, the advice-of-counsel theory of defense instruction would not have been applicable.

¶ 28. Second, the trial court concluded that the evidence did not warrant the instruction. The *Cheek* five-part test is couched in conjunctive, not disjunctive, terms. Ross had to present evidence, which when viewed in a light most favorable to him, demonstrated that he fulfilled all five requirements of the test. He claims that "[t]he record is replete with testimony upon which a jury could have found, if properly instructed, that [he] relied on the advice of counsel and, hence, did not willfully violate the law."[5] We are not convinced.

---

[5] Ross makes this argument without proper citation to the record. This court is not required to sift through the record for facts to support Ross's contention. *See Keplin v. Hardware Mut. Cas. Co.*, 24 Wis. 2d 319, 324, 129 N.W.2d 321 (1964). It is his responsibility to provide this court with proper references to the record. *See* WIS. STAT. § 809.19(1)(e).

¶ 29.　In denying the request to submit the advice-of-counsel instruction, the trial court listed several reasons. For the purposes of our analysis, we shall examine these reasons and, where appropriate, amplify the basis for these reasons from the record.

¶ 30.　First, there is no evidence in the record that during the months of February, March, and April 1997, Ross sought the advice of his attorney, Gundy, as to his intended solicitation of stock purchase orders in Wisconsin. The record reveals that well-attended solicitation meetings were conducted on February 21–22 and April 19, 1997. Yet, there is no indication that Ross asked Gundy how to properly conduct these solicitation events.

¶ 31.　Second, for the purposes of either seeking an exemption from registration or obtaining registration approval, there is no evidence that Ross ever fully revealed to Gundy the nature of his corporate and/or partnership interests in this telephone enterprise and what entity actually held authority to engage in the telecommunications business in Wisconsin.

¶ 32.　Third, late in February 1997, Gundy was informed by DFI of what was required of ICCI to obtain proper registration of the securities it intended to sell to the public. There is no claim that Ross did not also know of these requirements. Yet, he ignored the advice of both DFI and Gundy and continued to solicit individual investments. Even after the April 19 solicitation meeting which precipitated a May 2 sales stop order, Ross continued to solicit and accept stock subscription agreements while, at the same time, Gundy attempted to implement the stop order. The egregiousness of the stop-order violations reached its limit when in a No-

vember 19th agreement, Ross consented to sell 50.1% of his shares in ICCI to Sharon Cooper who months earlier had become his assistant.

¶ 33. From this review, we conclude that Ross failed to meet the five-part *Cheek* test in at least two respects and, therefore, the trial court did not err in rejecting the proposed advice-of-counsel theory of defense instruction.

## C. Evidentiary Rulings.

¶ 34. Ross next claims that the trial court erroneously exercised its discretion in making three evidentiary rulings: (1) admitting evidence of investor losses; (2) denying the admission of documentary evidence supporting the assertion that market forces caused the collapse of ICC; and (3) excluding evidence as to why Gundy agreed to a plea bargain.

¶ 35. The admission of evidence is within the discretion of the trial court. *See State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983). We review a trial court's ruling on the admissibility of evidence for an erroneous exercise of discretion. *Id.* To sustain a discretionary ruling, we need only find that the trial court examined the relevant facts, applied a proper standard of law and, using a rational process, reached a reasonable conclusion. *Franz v. Brennan*, 150 Wis. 2d 1, 6, 440 N.W.2d 562 (1989). " 'In determining a dispute concerning the relevancy of proffered evidence, the question to be resolved is whether there is a logical or rational connection between the fact which is sought to be proved and a matter of fact which has been made an issue in the case.' " *State v. Alsteen*, 108 Wis. 2d 723, 729–30, 324 N.W.2d 426 (1982) (citation omitted). Al-

312

though relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of confusion of issues. WIS. STAT. § 904.03. With these standards in mind, we now examine each of the evidentiary challenges.

¶ 36. In a pretrial motion, Ross moved to exclude any evidence of losses sustained by investors in the ICCI enterprise—that any investor was harmed emotionally or financially by the failed investment, that ICCI did not make promised refunds, and that ICCI and ICCW sought protection in bankruptcy. The trial court denied the motion, but did allow Ross to offer evidence that the failure of the company, and hence the cause of the losses that the investors sustained, was attributable to the unreasonable demands asserted by Ameritech or other causes unrelated to Ross's misrepresentations or other misconduct. There are two sound reasons why the trial court did not err in its ruling.

¶ 37. First, the State charged Ross with a violation of WOCCA. To sustain its burden of proof, the State had to show that Ross profited from engaging in a pattern of racketeering activity. *See* WIS. STAT. § 946.83 ("No person who has received any proceeds with knowledge that they were derived, directly or indirectly, from a pattern of racketeering activity may use or invest . . . any part of the proceeds . . . derived from the investment." WISCONSIN STAT. § 946.82(3) defines "pattern of racketeering activity" as engaging in at least three incidents of racketeering activity that produce the same results. Six investors— William Anderson, Jeffrey Lewis, Frederick Kinlow, Antoinette Kinlow, Gene Lacy, and Pamela Lewis—testified as to losses they sustained as a result of the securities fraud, which were the incidents of racketeering activity. There is a logical

connection between the security fraud and the losses. Thus, the testimony of the losses suffered by the investors was directly relevant to the proof of the WOCCA charge.

¶ 38. Second, when the DFI learned that ICCI had improperly sold securities to Wisconsin investors and was not exempt from registration, it required that ICCI offer to rescind all prior sales and refund the proceeds of those sales to any investors who desired refunds, before ICCI could qualify for registration. Therefore, testimony relating to the rescission efforts was relevant and admissible.

¶ 39. The same six investors noted above testified that they received written offers of rescission and refund. These investors testified that they each replied to the offers, but did not receive a refund. This testimony related to whether there was a violation of Chapter 551—Wisconsin's Uniform Securities Law.[6] The testimony demonstrated that orders of the DFI were not followed. Thus, this testimony was relevant.

---

[6] Ross was charged and convicted of violating WIS. STAT. § 551.41, which provides:

> **Sales and purchases.** It is unlawful for any person, in connection with the offer, sale or purchase of any security in this state, directly or indirectly:
>
> . . . .
>
> **(2)** To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]

¶ 40. Next, Ross claims trial court error in denying admission of two letters to establish his defense that market forces, particularly what he alleged to have been unfair business practices by Ameritech, caused the downfall of ICCI. Specifically, the letters detailed ICCI's complaints about Ameritech's unreasonable financial demands, unreasonable delays in approving service to customers, and lack of cooperation in billing procedures. The two letters were written by Gundy. One letter was addressed to the chairman of the Federal Communications Commission, the other to the Telecommunications Subcommittee of the United States Senate Commerce Committee.

¶ 41. The trial court ruled that ICCI would be able to introduce evidence that its business failure was caused by unfair actions by Ameritech. In fact, Ross testified about the practices engaged in by Ameritech, which were the subject matter of the letters. Nevertheless, the trial court refused to admit into evidence the letters on the basis that they would "sidetrack the jury."

¶ 42. The expressed basis for the trial court's ruling notwithstanding, Ross suffered no harm. He was able to testify about the substance of the letters and argue about the effect that Ameritech's actions had in the demise of ICCI. Ross was not denied the opportunity of presenting his theory of defense, nor was the jury denied any information to support his theory. The trial court did not erroneously exercise its discretion.

¶ 43. Lastly, Ross contends the trial court erred by improperly limiting the cross-examination of his former attorney, Gundy. The extent and scope of cross-examination allowed for impeachment purposes is a matter within the sound discretion of the trial court.

*State v. McCall*, 202 Wis. 2d 29, 35, 549 N.W.2d 418 (1996). We shall reverse a trial court's determination to limit or prohibit a certain area of cross-examination attempting to show bias only if the trial court's determination represents an erroneous exercise of discretion that is prejudicial. *State v. Lindh*, 161 Wis. 2d 324, 348–49, 468 N.W.2d 168 (1991). No erroneous exercise of discretion will be found if a reasonable basis exists for the trial court's determination. *State v. Oberlander*, 149 Wis. 2d 132, 141, 438 N.W.2d 580 (1989).

¶ 44. The State charged Gundy as an accomplice to Ross's criminal activity. Gundy was arrested in Maryland, and brought back to Milwaukee where he was held in custody. Ross contends that pursuant to a plea agreement, Gundy was released from custody, and secured leniency in return for his testimony against Ross. Ross argues that he should have been allowed to make inquiry about Gundy's release from custody as a possible motive for false testimony. If that were the case, indeed Ross's counsel would have been entitled to question Gundy about his release from custody. The error of this contention, however, as pointed out by the trial court, is that Gundy had secured his release before a plea agreement had been reached.

¶ 45. Thus, a reasonable basis existed to limit the scope of cross-examination. Furthermore, Ross was able to cross-examine Gundy about the benefits of his plea bargain—namely, that as a result of his agreement to testify, Gundy's potential incarceration had been reduced from thirty-five years to ten years, and that if convicted, the State would recommend straight probation without any jail time. From this review, we conclude that a reasonable basis existed for the trial court

to limit the scope of factors that may have motivated Gundy's decision to testify against Ross.

*D. Claim of Mistrial.*

¶ 46. Lastly, Ross claims the trial court erred in denying his motion for a mistrial after the court admonished him about his demeanor and style of testimony.

¶ 47. The decision whether to grant a motion for a mistrial lies within the sound discretion of the trial court. *Haskins v. State*, 97 Wis. 2d 408, 419, 294 N.W.2d 25 (1980). The trial court must determine, in light of the whole proceeding, whether the claimed error was sufficiently prejudicial to warrant a new trial. *State v. Grady*, 93 Wis. 2d 1, 13, 286 N.W.2d 607 (Ct. App. 1979). The denial of a motion for mistrial will be reversed only on a clear showing of an erroneous use of discretion by the trial court. *Johnson v. State*, 75 Wis. 2d 344, 365, 249 N.W.2d 593 (1977).

¶ 48. WISCONSIN STAT. § 906.11(1) requires: "[t]he judge shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence . . . ." This authority, however, is not without limitation. "While the court cannot function as a partisan, it may take necessary steps to aid in the discovery of the truth." *State v. Nutley*, 24 Wis. 2d 527, 562, 129 N.W.2d 155 (1964), *overruled on other grounds, State v. Stevens*, 26 Wis. 2d 451, 463–64, 132 N.W.2d 502 (1965).

¶ 49. During the presentation of the State's case, the trial court expressed its dissatisfaction with Ross's demeanor as he listened to the testimony of the State's witnesses. The incident, however, which gave rise to

this claim of error occurred while Ross was testifying on direct examination.

[DEFENSE COUNSEL:]

Q: All right. Did you eventually authorize lawyers acting on your behalf to go to court and file litigation against Ameritech in the summer of 1997?

[MR. ROSS:]

A: How many times do I have to answer that question?

Q: Probably not many.

THE COURT: Mr. Ross, I don't appreciate your sarcasm, your flippancy. This is a court of law. This is supposed to be question and answer. This is not the pulpit. This is not a meeting. This is not a speech. In addition to that, by rambling on as you have, you make it extremely difficult for the court reporter because you speak so quickly. Now, I would appreciate it if you will show this Court respect and obey these instructions.

[MR. ROSS:] Now, I —

[DEFENSE COUNSEL:]

Q: Did you authorize lawyers on your behalf to file litigation against Ameritech here in Milwaukee County?

THE COURT: That's a yes or no, Mr. Ross.

[MR. ROSS:] The State had five days to run the case against me. All I'm asking for is a little time.

318

> THE COURT: Mr. Ross, you will follow the rules of law. We are going to take the lunch break now. Talk to your client, Mr. Fitzgerald. We'll resume at two. You have a two-hour lunch break because of the other calendar of this Court at 1:30. Ladies and Gentlemen, be back at two.

Before the trial resumed, Ross apologized to the court and promised to conduct himself with proper decorum. There were no further incidents.

¶ 50. It is this brief exchange that forms the basis for Ross's request for a new trial. He argues that the trial court's comments amounted to impermissible editorializing regarding the factual issues being considered by the jury. He contends that by the disparaging references to "pulpit," "a meeting," and "a speech," the court was in effect commenting on the evidence and Ross's credibility in front of the jury. We are not persuaded.

¶ 51. To suggest that the trial court's admonishing comments reflect in any manner upon Ross's credibility defies a reasonable reading of the recorded exchange. There is not a scintilla of evidence that casts any reflection on the issues germane to the merits of the case. Nor are we able to ascertain any evidence that would form a basis to paint the trial court as an advocate of the State's position. Based upon our review of Ross's testimony, we conclude that the brief admonitory remarks of the trial court, particularly in light of Ross's earlier improper deportment, were well within the proper range of the court's power to take all necessary steps to aid in the discovery of the truth. Thus, a new trial was not warranted.

*E. Restitution Order.*

¶ 52. Ross claims the trial court erred when it ordered that he pay restitution of no more than

$587,100 to the victims of his crimes who submitted requests to the Department of Justice. He argues that the violations charged under Chapter 551 are independent of any loss to the investors. Rather, ICCI's undercapitalized and mismanaged state led to its inevitable financial collapse. He suggests that because there is no causal nexus between the losses to investors and the crimes charged, the trial court erroneously exercised its discretion in ordering restitution. He further contends that part of the restitution ordered represents sales transactions that occurred outside of Wisconsin, over which Wisconsin had no jurisdiction. Therefore, he asks that we reverse the restitution order and remand for a factual determination of which transactions are properly a subject of this litigation. We reject Ross's requests.

¶ 53. We review the propriety of an order for restitution by the erroneous exercise of discretion standard. We shall reverse a trial court's exercise of discretion "only if the [trial] court applied the wrong legal standard or did not ground its decision on a logical interpretation of the facts." *State v. Canady*, 2000 WI App 87, ¶ 6, 234 Wis. 2d 261, 610 N.W.2d 147.

¶ 54. Wisconsin's criminal restitution statute, WIS. STAT. § 973.20, imposes a duty upon the sentencing court to order restitution to the victim of a crime. The statute is to be interpreted " 'broadly and liberally in order to allow victims to recover their losses as a result of a defendant's criminal conduct.' " *Canady*, 2001 WI App 87 at ¶ 8 (citation omitted). Restitution is the rule and should be ordered whenever warranted. *Id.* To warrant restitution, "a causal nexus must be established between 'the crime considered at sentencing' . . .

and the disputed damage." *Id.* at ¶ 9 (citation omitted). The "victim must show that the defendant's criminal activity was a 'substantial factor' in causing damage." *Id.* (citation omitted). The crime "encompass[es] all facts and reasonable inferences concerning the defendant's activity related to the 'crime' for which he has been convicted, not just those facts necessary to support the elements of the specific charge of which the defendant was convicted." *State v. Madlock,* 230 Wis. 2d 324, 333, 602 N.W.2d 104 (Ct. App. 1999) (citation omitted). In considering restitution, the court should take into account the defendant's "entire course of conduct." *State v. Rodriguez,* 205 Wis. 2d 620, 627, 556 N.W.2d 140 (Ct. App. 1996).

¶ 55. The State charged Ross with violating WOCCA by participating in ICCI through a pattern of racketeering activity. The offenses that formed the basis for the racketeering charge were five acts of security fraud under Chapter 551. It was undisputed that ICCI did not register its securities or obtain an exemption from registration. The jury convicted him of fraud in the offer and sale of securities, filing a false registration document, and violating a stop order by continuing to sell securities under the same circumstances. Thus, the very purposes for which WOCCA and Chapter 551 were enacted, i.e., protection of the investing public were frustrated by Ross's actions. These statutes were enacted to provide, among other things, disclosure of the financial condition and the state of management of the entity seeking to attract investor interest. Had such disclosure been provided through procedures required by the legislature, improvident investment such as occurred here could have been avoided. We agree with the State that the object of

concern when considering the appropriateness of restitution ought to be what caused individuals to invest in the ICCI enterprise. There is little doubt that fraud and lack of full disclosure were substantial factors in attracting investors, leading to the losses they suffered.

¶ 56. Ross also argues that the restitution order improperly included victims who purchased ICC securities outside of Wisconsin. Thus, he claims these sales were not subject to Wisconsin law and therefore had no causal nexus to the crimes of which he was convicted. Again, we are not persuaded.

¶ 57. Ross was convicted of a pattern of racketeering involving securities fraud contrary to WIS. STAT. §§ 551.41(2) and 946.82(2), (3), (4) and 946.83 (WOCCA). This pattern of racketeering, which found its basis in the fraudulent activities occurring in Wisconsin contrary to the securities law, also affected investors in other parts of the country. By claiming at various times that the securities he was selling were registered in Wisconsin (which implied disclosure) when they were not, and then continuing to sell these securities after a stop order had been issued, Ross aided in creating victims in other states. Thus, it is clear that the fraudulent activities perpetrated in Wisconsin were a substantial factor in attracting investors in other states, which provides the proper nexus between the crimes and the losses to out-of-state victims.

¶ 58. For these reasons, Ross's challenges to the order for restitution fail.

*By the Court.*—Judgment affirmed.