David M. GAINER and Dana M. Gainer, Personally and as Special Administrator of the Estate of Justin R. Gainer, Waukesha County Department of Health & Human Services, Wisconsin Physicians Service Insurance Corporation, MSI Insurance Company and Milwaukee Carpenters District Council Health Fund, Plaintiffs-Appellants,†

v.

Thomas J. KOEWLER, M.D., Kathy D. Sturino, M.D., Wisconsin Health Care Liability Insurance Plan and Patients Compensation Fund, Defendants-Respondents.

Court of Appeals

*No. 94–2929. Submitted on briefs December 15, 1995.—Decided February 7, 1996.*

(Also reported in 546 N.W.2d 474.)

†Petition to review denied.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *J. Michael End* of *Gran & End* of Milwaukee.

On behalf of the defendants-respondents Kathy D. Sturino, M.D., Wisconsin Health Care Liability Insurance Plan and Patients Compensation Fund, the cause was submitted on the brief of *Donald R. Peterson* and *Peter F. Mullaney* of *Peterson, Johnson & Murray, S.C.* of Milwaukee.

On behalf of the defendants-respondents Thomas J. Koewler, M.D., Wisconsin Health Care Liability Insurance Plan and Patients Compensation Fund, the cause was submitted on the brief of *James R. Gutglass* and *Judith P. Sullivan* of *Gutglass, Erickson & Bonville, S.C.* of Milwaukee.

Before Anderson, P.J., Brown and Nettesheim, JJ.

BROWN, J. David M. Gainer and Dana M. Gainer claimed that their child, Justin R. Gainer, was the victim of negligence by two physicians involved in Justin's birth. The jury found no negligence as to either doctor. The Gainers' appeal is almost wholly based on what they perceive to be the misconduct of the attorney for one of the doctors. Because the trial court's rulings regarding these issues were the product of a reasonable and rational mental process and because we owe defer-

ence to the discretionary choice by the trial court regarding these matters, we affirm. Nonetheless, we are very concerned about counsel's tactics and will address these concerns.

The evidence, taken in a light most favorable to the verdict, is as follows. Dana was the patient of Thomas J. Koewler, M.D., a family practitioner who delivers sixty to eighty babies a year. Koewler does not have privileges to perform cesarean section or vacuum extraction deliveries and must have an obstetrician's approval before performing certain other procedures, such as administering an epidural.

Kathy D. Sturino, M.D., was the on-call obstetrician for Waukesha Memorial Hospital on Christmas Eve, 1988. She received a telephone call at about 9:00 p.m. from Koewler advising her that Dana had been in labor most of the day and was uncomfortable. Koewler called because he wanted to give an epidural for pain relief. The two doctors discussed the epidural and the fetal heart monitor, which was reassuring. Sturino approved the epidural and told Koewler that she would go to the hospital at Koewler's request, but he did not request her presence at that time.

At 11:35 p.m., Koewler again called Sturino and informed her that the baby's heartbeat was decelerating. Koewler detailed the frequency of Dana's contractions and the fetal heart monitor tracing. Based upon this information, Sturino recommended that Koewler perform a scalp pH on the baby. Koewler called Sturino at approximately 12:20 a.m. on Christmas morning to report that the scalp pH was normal.

Then, at about 12:50 a.m., Koewler called Sturino for the fourth time and advised Sturino that the baby had encountered an episode of bradycardia (low heart rate) which had resolved. Koewler also asked Sturino

116

to come to the hospital, evaluate Dana and deliver the baby by vacuum extraction.

Sturino arrived at the hospital at 1:08 a.m. She determined that Justin needed to be delivered immediately and also determined that delivery should be accomplished vaginally by use of a vacuum extractor. The extractor was applied to Justin's head at 1:28 a.m., but after attempted delivery, the extractor disengaged and fell to the floor. Sturino investigated whether another extractor should be applied, determined that it should not and ordered an operating crew to come to the hospital so that a cesarean section could be performed. The cesarean section was performed at 2:05 a.m. and Justin was delivered at 2:11 a.m. Justin was severely neurologically impaired at birth and died after a little more than two years.

At trial, the expert witnesses for the Gainers testified that the doctors were negligent in not delivering Justin earlier, that the vacuum extraction procedure should have been performed more expeditiously and that an operating crew should have been on stand-by, or at least on hand earlier. The expert witnesses for the doctors testified that the treatment was well within the standard of care and that the facts show that Justin had neurological problems prior to labor. The jury found for the doctors. Further facts will be forthcoming as necessary.

## Motion in Limine

Prior to trial, the Gainers moved the trial court for an order that no mention be made at trial of the fact that David had been arrested and convicted of spousal abuse. The trial court ordered that nothing be said without a hearing. When Dana testified on direct

examination, no mention was made of any marital problems caused by Justin's injuries.

Nonetheless, on cross-examination, Koewler's attorney asked and Dana answered the following questions:

[Counsel]: Your marriage has had some problems in the past—

Dana: Yes.

[Counsel]: —unrelated to the unfortunate circumstances of Justin with respect to separations and that sort of thing?

Dana: No. I think stemming from—actually, if you want me to be perfectly honest with you our marriage suffered a lot when this happened to us with our son. Two years of dealing with financial difficulty with dealing with a sick child, with dealing with social service giving you deadlines to make decisions on that are not easy decisions to make at all that we did not take lightly, but being pressured. Yeah, we had some very difficult times in our marriage, but we're still together, and I think that testifies to something.

[Counsel]: But neither you nor your husband ever advised authorities that might have been called to your home because of problems that you were having that the problems you were having were related to Justin, did you?

Dana: Actually, I believe that Dave did at one point do that.

[Counsel]: How so? He told police that the problems you are having were related to Justin?

Dana: I think it's documented somewhere.

[Counsel]: Where?

118

Dana:　I'm not sure.

[Counsel]:　Maybe I should ask you

．．．．

At this point, the Gainers' attorney objected to the line of questioning. The court sustained the objection and Koewler's attorney concluded his cross-examination. After a very brief cross-examination by Sturino's attorney had concluded and the jury was out of the courtroom, the Gainers' attorney moved for mistrial on the grounds that Koewler's attorney had violated the motion in limine order. Koewler's attorney responded that he had not violated the order, which order he reminded the court he had readily assented to, because he had not mentioned the words "arrest," "conviction" or "any kind of record."

After some colloquy between the trial court and counsel, the trial court asked Koewler's attorney why he injected the words "authorities" and "police?" The attorney replied that he only used the term "authorities," but the trial court corrected him. The trial court then took the motion under advisement and adjourned the trial over the noon hour.

After the recess, the trial court addressed the motion. The trial court reiterated its ruling, understood and agreed upon by all parties beforehand, that if any questions were going to be asked regarding the conduct of the Gainers in their marital history, the court would first be alerted. The court called the set of questions and the timing of the questions "inexplicable" in terms of the ruling. The court saw "no purpose" for the questions or for using the words "authorities" and "police." The court noted that the area of marital discord had not been gone into on direct examination of Dana. The court also commented that nobody had a

police report to refer to in relation to these improper questions. But then the court noted that this was the midpoint of the trial and decided to take the motion under advisement until a further time.

After the verdict and at the postverdict hearings, the trial court decided against the mistrial. Again, the trial court recognized that Koewler's attorney had violated the motion in limine order and again termed the violation "inexplicable." But the court determined that Dana "fielded those questions well" and that she was a "credible witness." The trial court noted that her responses showed a "sympathetic witness, a witness that could be empathized with" and that this "balanced off" against any "bias or denigration in the jury's eyes that may have taken place by this reference." The court also noted that neither Koewler's nor Sturino's attorney treated the witnesses with disrespect or badgered or challenged them. The court additionally commented that Koewler's attorney did not establish a pattern; the incident was isolated. The trial court concluded that the line of questioning was not prejudicial.

The conduct of a trial is subject to the exercise of the trial court's discretion; its determinations will not be disturbed unless there is prejudice. *Valiga v. National Food Co.,* 58 Wis. 2d 232, 253, 206 N.W.2d 377, 389 (1973). We are satisfied that the trial court exercised its discretion in the appropriate manner. The trial court carefully reviewed that part of the testimony at issue. It obviously concluded that Dana's answers explained to the jury in a common-sense manner that the unfortunate circumstances surrounding Justin's birth brought pressure to bear upon the marital relationship, that the pressures were at times severe, but that the marriage survived. We view the trial court as

120

having determined that the jury was at least as likely to look upon the Gainers with approval based on Dana's answers as with disapproval.

The Gainers point to the trial court's conclusion that Dana was a "credible witness" and claim that whether Dana was credible or not in the trial court's view is not the issue; the issue is whether the jurors would react negatively knowing that David had done something warranting the police having to be called to the Gainer home. We agree that this is the issue, but we conclude that the Gainers misunderstand the thrust of the trial court's comments. The trial court was not saying that because Dana was a credible witness, the jury was unbiased. Rather, the trial court was saying that Dana, a credible witness, answered the improper line of questioning in a manner which diffused any prejudice that might have ensued and indeed may have turned the situation into a good rather than a bad moment for the plaintiffs. We will not quarrel with the trial court's assessment.

That having been said, we feel obliged to comment upon this attorney's actions. This is not the first time the court of appeals has been faced with an attorney who has violated an order keeping out prejudicial material at least until there has been a hearing on it. Unfortunately, these cases are unpublished and we cannot refer to them. But we fear that this is happening with increasing frequency. The scenarios differ, but a common thread seems to be that it happens in a jury case of some length. The suspect line of questioning is gone into when the trial is well underway. It is almost as if the attorney takes the risk that the trial court will be more inclined to finish the trial than declare a mistrial due to prejudice. Thus, the jury hears the damaging evidence and the lawyer gets what he or she

wants with little more than a rebuke from the trial court.

We are not ready to accuse this attorney of having intentionally pursued this tactic. We are convinced, however, that the bar and, particularly, the bench, should be aware of the phenomenon and take measures designed to increase the risks for those attorneys who persist in this strategy.

Legal ethics is a subject of increasing discussion in the legal world. Thomas Reavely, now a senior judge of the United States Court of Appeals for the Fifth Circuit, referred to "Rambo litigators" in an article he wrote. He observed that the Rambo litigator has two separate facets: intimidation and unfair tactics. *See* Thomas M. Reavely, *Rambo Litigators: Aggressive Tactics versus Legal Ethics*, TRIAL, May 1991, at 63. We believe that while the word "Rambo" conjures up an image of sharp and nasty practices, the term can just as easily define a lawyer who is courteous and unabusive, but nonetheless deceptive.

To increase the costs associated with deceptive behavior, particularly as it regards violating motion in limine orders, our courts must be alert to the possibility that the lawyer who is violating the order is assuming there will be little or no risk associated with bringing out the damaging material during a long trial. One commentator referred to allowing deceptive behavior as creating a variant of Gresham's Law. That is, when two currencies of unequal intrinsic value (such as silver and base metal coins) are given the same value as legal tender, the "bad" coinage will displace the "good" coinage because people who can get value for base metal coins will do so in preference to spending their silver. Gideon Kanner, *Rambo, Go Home: of Ethics, Tactics and Judges*, TRIAL, September 1991, at 106.

In the legal system, if deceptive conduct receives the same currency in the courtroom as proper conduct because the court gives great weight to calendar considerations, the deceptive conduct displaces the proper conduct and the result is an increase in Rambos. Increased judicial control in this area could change the nature of the adversarial system for the better.

■

We note that among the specific provisions of Wisconsin rules governing attorney professional conduct, SCR 20:3.4(c) states that a lawyer shall not:

> knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists.

When the trial court determines that the litigator has violated this provision, several appropriate remedies are available for driving up the cost of violation. First, if the court finds the violation prejudicial and declares a mistrial, it may assess costs of the trial against the offending attorney. Sections 805.03 and 804.12(2)(b), STATS. Second, irrespective of the prejudice component, the court may report the incident to the state Board of Attorneys Professional Responsibility. Third, the court can go on the record with a pretrial order forbidding specific prejudicial questioning, warn the lawyers that they may not refer to it, suggest that they will be held in contempt if they violate the order, and then summarily enforce the contempt if, after all of that, the order is nonetheless violated. Sections 805.03 and 804.12(2)(a)4.

Finally, violating pretrial orders is but one facet of the civility movement. There are lawyers who make false statements of law or fact to the court, who engage in abusive or obstreperous conduct, who instruct both

123

client and nonclient witnesses not to answer during depositions, who insist on constantly conferring with clients during adverse examinations, who make groundless "work product" objections, who interpret the questions for the witness before answers are given, and who hide evidence or documents. *See* John Walsh, Trial Ethics and Dealing with the Disruptive Litigator (Jan. 25, 1996) (unpublished outline of presentation at Wisconsin State Bar Mid-Winter Convention). Our dicta is far reaching enough without discussing these areas of concern. Suffice it to say, however, this court's warning shot across the bow, we hope, will help alert everyone in the legal profession that it is time for the judiciary to exercise more control.

### *Closing Arguments*

The Gainers fault Koewler's attorney for making five references to facts during his closing argument that were not in the record. First, he said that Dr. Giles, one of the Gainers' experts, testified in Wisconsin a lot, that he had personally cross-examined Giles several times, that Giles was "always for the patient" and, pointing to stacks of depositions piled on his table, said that none of them were for the doctor. The Gainers claim that he was, in fact, testifying and using facts not in the record, that the only testimony was that he had previously examined Giles twice before, and his courtroom behavior improperly led the jury to think that Giles committed perjury on the stand when he told the jury that Giles testifies for the plaintiff about seventy percent of the time and for the doctor about thirty percent of the time.

Second, the Gainers' experts testified that the standard of care in 1988 was to deliver a baby within thirty minutes of the decision to do an expedited deliv-

ery. The Gainers observe that Koewler's attorney told the jury the "hospital protocol" only required delivery "within thirty minutes of the time you call for the C-Section crew." The Gainers argue that there was absolutely no evidence in the record whatsoever relating to the protocol of the hospital and, moreover, the evidence is that the delivery occurred sixty-three minutes after the call.

Third, Koewler's attorney, who had been retained by Koewler's insurer, told the jury that Koewler was "nice enough to retain me to represent his viewpoint." The Gainers assert that this remark improperly led the jurors to think that Koewler was at financial risk and was having to pay this attorney to represent him "through years of litigation."

Fourth, this attorney told the jury that "perinatal asphyxia can be minutes, hours, days before and after the delivery." The Gainers claim there is no evidence supporting this remark.

Finally, Koewler's attorney told the jury that CT and MRI scans do not diagnose cerebral palsy, that most films are normal, and that most cerebral palsy children have it subclinically. The Gainers claim that no evidence supports these remarks.

After closing arguments had concluded and before the jury had been sworn, the Gainers noted each of these concerns and moved for a mistrial. The trial court basically ruled that while some of the statements were not backed by the record, they were not sufficiently prejudicial to require a mistrial. With regard to the statement about Koewler personally retaining his trial counsel, the court took that under advisement.

After the verdict, the trial court confirmed its rulings made earlier and also denied the remaining motion for a mistrial. Again, the court did not really

take issue with the claim that Koewler's attorney had referred to facts not of record. However, the court said that it instructed the jurors that attorneys' opinions, statements and arguments are not evidence. It also again concluded that the remarks were not of sufficient notoriety as to cause prejudice to the jurors.

Again, the choice here is committed to the sound discretion of the trial court. *Wagner v. American Family Mut. Ins. Co.*, 65 Wis. 2d 243, 249, 222 N.W.2d 652, 656 (1974). Attorneys are entitled to reasonable latitude in argument and when commenting on the evidence. *Affett v. Milwaukee & Suburban Transp. Corp.*, 11 Wis. 2d 604, 613, 106 N.W.2d 274, 280 (1960). It is the trial court which assesses the reasonableness of the argument. To reverse the trial court, we must be convinced that the result would, in all probability, have been in favor of the appellants had the improper comments not been made. *Wagner*, 65 Wis. 2d at 250, 222 N.W.2d at 656.

Based on the above standard, we cannot reverse. While this kind of lawyering again gives us pause, we cannot say that the result would have been different had the comments not been made. After reading the entire record, we are convinced that the jurors had a plethora of information concerning how the experts viewed the doctors' standard of care. Their decision is soundly supported by evidence, such that the result would not have changed even if Koewler's attorney had properly related the facts of record.

126

*Alleged Nonresponsive and Prejudicial Testimony*

■

Lastly, the Gainers cross-examined one of the doctors' experts regarding his appearance before the Wisconsin legislature in connection with efforts to place a cap on noneconomic damages. When asked the purpose for his appearance, the expert responded that his objective was to lower liability premiums for obstetricians. He said that it "costs me $300 a day for liability while I am sitting here and couldn't harm anybody." There was no objection to this answer as nonresponsive. The issue was not raised until the postverdict motions. At that time, the Gainers claimed, and claim now, that the answer was nonresponsive. We hold, as did the trial court, that the Gainers waived the issue by not raising it at trial. *Terpstra v. Soiltest, Inc.*, 63 Wis. 2d 585, 593, 218 N.W.2d 129, 133 (1974).

## *Interests of Justice*

It might be asked why we do not reverse on this ground since we have devoted so much attention to what could well be considered unfair tactics. We have already stated that our standard of review compels us to conclude that the trial court was not wrong in declining to grant the Gainers a new trial. And the trial court's legitimate reasoning process, based upon the facts of record, also convinces us that the real issues were tried and that justice has not miscarried. *See Vollmer v. Luety*, 156 Wis. 2d, 1, 19, 456 N.W.2d 797, 805 (1990). In sum, our confidence in the reliability of the jury's verdict is not undermined here such that reversal in the interests of justice is appropriate.

*By the Court.*—Judgment affirmed.