Sᴛᴀᴛᴇ of Wisconsin, Plaintiff-Respondent,

v.

Sylvester Sɪɢᴀʀʀᴏᴀ, Defendant-Appellant.†

Court of Appeals

*No. 03–0703–CR. Submitted on briefs October 23, 2003.—
Decided December 10, 2003.*

**2004 WI App 16**

(Also reported in 674 N.W.2d 894.)

† Petition to review denied 2-24-04.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *John A. Pray* of *Frank J. Remington Center, University of Wisconsin Law School,* Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *David H. Perlman*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Anderson, P.J., Brown and Nettesheim, JJ.

¶ 1. ANDERSON, P.J. Sylvester Sigarroa appeals from a judgment of conviction and an order denying postconviction relief for conspiracy to possess cocaine with intent to deliver contrary to WIS. STAT. §§ 961.41(1x) and 961.41(1m)(cm) (2001–02),[1] maintaining a dwelling that is used for manufacturing,

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

keeping, or delivering controlled substances contrary to Wɪs. Sᴛᴀᴛ. § 961.42(1); and possession of drug paraphernalia contrary to Wɪs. Sᴛᴀᴛ. § 961.573(1). Sigarroa argues that the police search of a trash dumpster located outside of his apartment building violated his Fourth Amendment rights because he had a reasonable expectation of privacy in his trash. Sigarroa also contends that the trial court erred in denying his motion for a mistrial made when a key State witness improperly implied to the jury that Sigarroa had a prior criminal record. We conclude that Sigarroa did not have an actual, subjective expectation of privacy; we further conclude that considering the facts and circumstances of this case, society would not recognize an expectation of privacy as reasonable. Finally, we conclude that under the entirety of the case, the impropriety of the statements by the State's witness was not so prejudicial as to affect the verdict, given that the court struck the statements at the time and that at the conclusion of trial, the court instructed the jury to "[d]isregard entirely any question that the court did not allow to be answered" and provided the jury with written instructions to ignore all things stricken. Therefore, we affirm.

## FACTS

¶ 2. The facts are undisputed. On February 13, 2001, at approximately 11:00 p.m., Detective David Janisch went to an apartment complex located at 314 Sentinel Drive in Waukesha. Janisch was acting on the basis of several anonymous tips that Sigarroa, who lived in apartment #2 of the complex, had been involved in recent drug dealings. Janisch planned to engage in a garbage search, a technique he had used "a couple of hundred times" in the past in drug investiga-

239

tions. Janisch drove into the apartment complex parking lot and then walked over to the dumpster, which was visible from the road and located approximately 170 feet from the public street and approximately 53 feet from the apartment building.

¶ 3. Janisch drove his car down the driveway past the apartment building, on which a "Private Property" sign was posted. Janisch testified that he did not see the sign. Janisch did not seek or obtain permission from the owner or from any of the residents to enter the property or to search the contents of the dumpster; he did not have a warrant authorizing an entry or search. Janisch did not have to walk through any barriers or gates to access the dumpster and the lid of the dumpster was open. Janisch testified that he reached into the dumpster and removed three or four black plastic garbage bags, which were knotted at the top. Janisch searched the garbage bags and found marijuana seeds and stems, a handwritten note stating that there was "weed" in a duffel bag in the closet, and some unburned "Chore Boy," an item he knew to be frequently used as a filter for ingesting crack cocaine.

¶ 4. Based on this evidence, along with other information, Janisch procured and executed a search warrant for Sigarroa's apartment on February 15, 2001. The search warrant resulted in the discovery of crack cocaine and drug paraphernalia.

¶ 5. Prior to trial, Sigarroa filed a motion to suppress the evidence the police obtained from the garbage dumpster, claiming that the warrantless search violated his Fourth Amendment rights against unreasonable searches and seizures. Following a suppression

hearing, the court denied the motion.[2] The court stated that there was a sufficient basis for the issuance of the search warrant based on the totality of all the evidence, which included that the dumpster was not enclosed and was available for use to the other residents in the apartment building.

¶ 6. Also, before trial, Sigarroa filed a motion in limine requesting, among other things, that the State be prohibited from any mention or use of Sigarroa's prior criminal conviction(s), if any, until a hearing was held to determine admissibility. At a hearing on the motion, the parties informed the court that they had entered into a stipulation as to how to handle Sigarroa's prior record in the event that he would choose to testify at the trial. The parties agreed that if Sigarroa were to testify, the State could ask Sigarroa if he had been convicted of a crime and, if he answered truthfully, the State could ask how many times. In response, Sigarroa would answer, "four." In other words, the parties agreed that mention of Sigarroa's criminal history would be made only if Sigarroa testified and then it would be limited to whether he had a prior record and to his total amount of previous convictions.

¶ 7. A jury trial was held on April 16 and 17, 2002. Sigarroa did not testify and called no witnesses in his defense. None of the State's witnesses testified during direct examination as to Sigarroa's criminal history. However, during cross-examination of Detective Paul Piakowski, defense counsel asked what background information Piakowski had been given before interviewing Sigarroa. The following exchange occurred:

[2] The pretrial ruling was made by Reserve Judge John Fiorenza. The jury trial was conducted by Judge Patrick Snyder.

[PIAKOWSKI]: The only background I had about the case was that—what we found, it was found on, whose apartment it was supposed to be, and Mr. Sigarroa's criminal history.

[DEFENSE COUNSEL]: So you are basically testifying you had no other conversation with any other police officer concerning this matter before you went in to talk to Mr. Sigarroa?

[PIAKOWSKI]: Just that Mr. Sigarroa had some prior —

[DEFENSE COUNSEL]: I move to strike your honor.

[COURT]: Thank you. The jury will disregard anything further. You only testify as to the question that is asked, sir.

¶ 8. During the course of the trial, the State presented the following major blocks of evidence in support of its case against Sigarroa:

1) The police executed the search warrant on Sigarroa's apartment and a vehicle parked outside the apartment and found 13 rocks of crack cocaine, a black postal-type scale, a glass pipe, two single edge razor blades in the kitchen area, several baggies, approximately $250 in cash, and a spiral notebook containing names and numbers appearing to be notations of drug transactions.

2) The comprehensive testimony of a co-conspirator in which she explained to the jury that she and Sigarroa would travel to Milwaukee to purchase crack cocaine, would then return to their apartment in Waukesha to cut up the cocaine into smaller rocks, would then package the smaller cocaine rocks in baggies, and then

242

resell the cocaine. This co-conspirator did not receive any consideration from the district attorney's office for her testimony; the prosecutor recommended a prison sentence pursuant to her conviction on a felony drug charge.

3) Sigarroa's confession, which was introduced through the testimony of Detective Piakowski. Piakowski related to the jury Sigarroa's statement that he could not work because of injuries sustained during a car accident and decided to sell crack cocaine to make ends meet. Piakowski further testified as to how Sigarroa told him how he and his co-conspirator would sell crack cocaine from their apartment, how they made a profit on this enterprise, and how he had placed the rocks of cocaine in his co-conspirator's coat pocket on the date the search warrant was executed. Piakowski reduced Sigarroa's statement to writing and then Sigarroa read the written statement. Sigarroa refused to sign or initial the statement; however, he told Piakowski that everything that was written down was true.

¶ 9. At the close of testimony, the court instructed the jury. Part of the court's instruction to the jury included the following:

Disregard entirely any question that the Court did not allow to be answered. Do not guess what the witness' answer might have been. If the question, itself, suggested that certain information might be true, ignore the suggestion; do not consider the evidence.

Additionally, the trial judge provided the jury with a written set of instructions including WIS JI—CRIMINAL 150 which states: "During the trial, the court has ordered certain testimony to be stricken. Disregard all stricken testimony."

243

¶ 10. After the jury had begun deliberations, the trial judge informed the parties of an incident which occurred during a recess. The judge stated that he had a conversation at lunch with the alternate juror who had been dismissed before the recess. The judge then described the following exchange:

> He [the alternate juror] said, that was an interesting experience. I said, I'm glad you enjoyed it, and he said something to the effect that you certainly shut that officer up in a hurry when he tried to talk about the prior act, prior drug or prior something. He used the word "prior." I reported that to the attorneys when I came back just for—because I felt I had an obligation to do so.

¶ 11. Upon hearing of the judge's encounter with the alternate juror, defense counsel moved for a mistrial, arguing that the officer's statement was prejudicial because the statement informed the jury that Sigarroa had a prior criminal conviction. The court took the motion under advisement and ultimately denied the motion, ruling that the curative instruction was sufficient and the evidence against Sigarroa was "overwhelming." After less than two hours of deliberation, the jury returned a guilty verdict on all three counts charged against Sigarroa.

¶ 12. In a postconviction motion, Sigarroa claimed that his trial counsel's objection to Piakowski's statement was inadequate in its failure to ask for a curative instruction telling the jury to disregard the statement. According to the motion, the court's instruction to the jury to "disregard anything further" was insufficient to inform the jury that it must disregard

the improper testimony that was already given.[3] However, at the postconviction motion hearing, the court ruled that counsel was not deficient in this regard, and that even if counsel had been deficient, Sigarroa was not prejudiced in view of the strength of the evidence against him. This appeal followed.

## LAW AND DISCUSSION

■

¶ 13. *Motion to Suppress and Constitutional Issue.* In reviewing a trial court's denial of a motion to suppress evidence, the trial court's findings of fact are to be upheld unless clearly erroneous. WIS. STAT. § 805.17(2); *State v. Roberts*, 196 Wis. 2d 445, 452, 538 N.W.2d 825 (Ct. App. 1995). However, whether a search passes constitutional muster is a question of law to be decided de novo. *Roberts*, 196 Wis. 2d at 452. This case is guided by the Fourth Amendment to the United States Constitution, which states: "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"[4] The Fourth Amendment does

---

[3] In Sigarroa's postconviction motion, he also claimed that in the event the court would conclude that the mistrial motion was untimely since it was not made until after the judge's conversation with the alternate juror, counsel was ineffective. In its response to the postconviction motion, the State conceded that the mistrial motion was timely.

[4] Sigarroa's appellate brief states that his argument that the search in this case violated the United States Constitution includes an assertion that the search violated article I, section 11 of the Wisconsin Constitution. While Sigarroa's brief does not make a separate argument as to the state constitution, we accept his request that we consider his appeal to be an assertion of a violation under both the federal and state constitutions.

not require that every search be made pursuant to a warrant, but the United States Supreme Court has stated that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the 4th Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).

¶ 14. The State and Sigarroa propose different tests for determining the constitutionality of a warrantless garbage search. Quoting *State v. Stevens*, 123 Wis. 2d 303, 316, 367 N.W.2d 788 (1985), Sigarroa proposes that whether the Fourth Amendment protects an individual's interest in garbage "depends on whether that individual can claim a reasonable expectation of privacy in that garbage which has been invaded by government action." Under *Stevens*, this determination involves a two-part test and Sigarroa urges that we apply it to the case at bar: (1) whether the individual by his or her conduct has exhibited an actual, subjective expectation of privacy, and (2) whether that expectation is justifiable in that it is one which society will recognize as reasonable. *Id.*; *see also State v. Rewolinski*, 159 Wis. 2d 1, 13, 464 N.W.2d 401 (1990).

¶ 15. The State agrees with Sigarroa that the ultimate determination is the individual's reasonable expectation of privacy, but contends that that conclusion can only be determined by applying a different two-step process: (1) whether the garbage was abandoned, and (2) whether the garbage was found within the curtilage or in open fields.[5] Citing *United States v. Dunn*, 480 U.S. 294, 301 (1987), the State urges that we

---

[5] BLACK'S LAW DICTIONARY 389 (7th ed. 1999) defines "curtilage" as follows: "The land or yard adjoining a house, usu.

apply the following four-pronged analysis to separately determine whether an area is within the curtilage or in open fields: (1) the proximity of the area claimed to be in the curtilage of the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature and uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by.

¶ 16. Both parties are able to cite case law in support of their competing approaches. However, upon close review of the relevant cases, it appears to this court that the law has moved away from the strict "curtilage" approach. Fewer and fewer cases speak to curtilage as a separate factor. The modern trend is to look at the issue in terms of the approach advocated by Sigarroa. For example, in *California v. Greenwood*, 486 U.S. 35 (1988), a case in which the defendant sought Fourth Amendment protection for garbage, the United States Supreme Court did not ground its ruling on the basis of curtilage. In fact, the opinion did not even mention whether Greenwood's garbage was inside or outside the curtilage. Rather, the Court's analysis is entirely geared toward whether Greenwood had a reasonable expectation of privacy in his garbage, which was left at curbside for collection. *Id.* at 40. Instead of

within an enclosure. Under the Fourth Amendment, the curtilage is an area usu. protected from warrantless searches."

BLACK'S LAW DICTIONARY 1118 (7th ed. 1999) defines the "open-fields doctrine" as follows:

> *Criminal procedure.* The rule permitting a warrantless search of the area outside a property owner's curtilage, which includes the home'and any adjoining land (such as a yard) that is within an enclosure or otherwise protected from public scrutiny. — Also termed *open-field doctrine; open fields rule.* Cf. PLAIN-VIEW DOCTRINE.

ruling whether the garbage was within the curtilage, the Court ruled that Greenwood could not reasonably expect privacy in his garbage for two reasons: (1) he placed his garbage bags on a public street where they were "readily accessible to animals, children, scavengers, snoops, and other members of the public"; and (2) he placed his garbage bags at the curb for the "express purpose of conveying it to a third party." *Id.*

¶ 17. Moreover, in *United States v. Shanks*, 97 F.3d 977, 978–79 (7th Cir. 1996), another case in which the defendant sought Fourth Amendment protection, this time for garbage placed adjacent to a public alley, the court said, "[T]he mere intonation of curtilage does not end the inquiry." There the court concluded that "Shanks could harbor no reasonable expectation of privacy since the garbage was essentially exposed to the public." *Id.* at 980.

¶ 18. Finally, in *State v. Yakes*, 226 Wis. 2d 425, 433, 595 N.W.2d 108 (Ct. App. 1999), a garbage case recently decided, we held that the defendant did not have a reasonable expectation of privacy in a dumpster that was in a commercial area because the area was open to the public and the defendant took no steps to privatize the area. *Yakes* differs from this case because the dumpster was in a commercial area. But *Yakes* is nonetheless instructive because both residential and commercial property are protected from unreasonable searches and seizures by the Fourth Amendment. *Lundeen v. Dep't of Agric., Trade & Consumer Prot.*, 189 Wis. 2d 255, 261, 525 N.W.2d 758 (Ct. App. 1994). The following excerpt from *Yakes*, 226 Wis. 2d at 430, demonstrates that the modern trend is to analyze such cases under the approach urged by Sigarroa:

Whether a warrantless search and seizure of garbage is constitutionally reasonable depends on whether the defendant had a legitimate expectation of privacy in the garbage. [*See California v. Greenwood*, 486 U.S. 35, 39 (1988).] There are two prongs to this determination. *See State v. Rewolinski*, 159 Wis. 2d 1, 13, 464 N.W.2d 401, 405 (1990). The first question is whether the individual challenging the search had a subjective expectation of privacy. *See id.* The second question is whether that expectation of privacy is one which society is prepared to recognize as legitimate. *See id.* In other words, the defendant must show that he or she had a subjective expectation of privacy that was objectively reasonable. [*See Greenwood*, 486 U.S. at 39–40.] (Footnotes omitted.)

¶ 19. Adhering to the development of the case law, we are persuaded that the proper analysis comes under the two-part test proposed by Sigarroa: (1) whether the individual by his or her conduct has exhibited an actual, subjective expectation of privacy, and (2) whether that expectation is justifiable in that it is one which society will recognize as reasonable. *Stevens*, 123 Wis. 2d at 316. This is not to say that the State's analysis is entirely off base. We simply hold that a discussion of curtilage/open fields appropriately falls *within* an expectation-of-privacy analysis and is not a separate factor as the State suggests.

¶ 20. Turning to the facts at hand, we first must determine whether Sigarroa demonstrated an actual, subjective expectation of privacy regarding the garbage he placed in the dumpster. Sigarroa claims that the following evidence "is sufficient to demonstrate that [he] had an actual, subjective expectation of privacy in his trash":

The apartment was rented in [Sigarroa's] name, so there is no question that he was a resident of the apartment and has proper standing to assert his expectation of privacy. *Cf. State v. Whitrock*, 161 Wis. 2d at 981. The trash was placed in a black plastic garbage bag that was tied at the top. The bag was placed in a dumpster on private property, well away from the road. The trash was not set out on a curb for collection, and the only practical way to access the dumpster was to travel 173 feet down a private driveway, past a "Private Property" sign. The dumpster had lids, and while the dumpster could be seen from the road, the trash inside could not. On the dumpster were signs warning "[D]o not play in, on or around or occupy this container for any purpose," and "[D]o not play on or around."

¶ 21. We do not agree that the above evidence sufficiently demonstrates that Sigarroa had an actual, subjective expectation of privacy in his trash. We reach this conclusion based on the following evidence. The garbage was placed in a dumpster located at the far rear of the apartment building property. The garbage was placed in the dumpster with the knowledge of and expectation that it would be picked up for disposal by the garbage collection service. While the property was surrounded on three sides by a fence, the fence did not impede access to the property or to the dumpster. Although the property had a "Private Property" sign and signs warning that there should be no playing around the dumpster, the signs did not bar observation of the dumpster from the street or impede access to the dumpster. The dumpster was located in an area totally unassociated with activities that would normally be associated with notions of privacy.

¶ 22. We now turn to the second prong of the two-part test and hold that even if Sigarroa had demonstrated an actual, subjective expectation of privacy, we cannot say that his expectation is justifiable in that it is one which society would recognize as reasonable. In making our determination, we look to whether our society would expect to have privacy in this garbage under the facts of this case. It is our view that society would not recognize a reasonable expectation of privacy when garbage is thrown into a dumpster with the knowledge and the expectation that control of the garbage would be turned over to third parties. Society would expect that while the most immediate third-party recipient of garbage in a dumpster would be a garbage collector, that is not the only third party one can envision taking control of this garbage. It would not be unreasonable under these facts for society to expect access to the garbage by other third parties (i.e., scavengers and the like) when such garbage is easily accessible to the public. As noted, this garbage was abandoned in a dumpster that was both visible from the street and had unimpeded access from the street. *See Greenwood*, 486 U.S. at 40. Garbage receptacles "cannot be equated to a safety deposit box," *United States v. Shelby*, 573 F.2d 971, 973 (7th Cir. 1978), and "[t]here is nothing unfair about requiring that people not discard things they want to keep secret, or destroy them before they do." *United States v. Kramer*, 711 F.2d 789, 792 (7th Cir. 1983). Evaluating this case on its particular facts, we hold that Sigarroa's Fourth Amendment protection claim fails.

¶ 23. *Motion for Mistrial.* We now address Sigarroa's claim that the trial court erred in denying his motion for a mistrial based on Piakowski's improper implication to the jury that Sigarroa had a prior criminal record.

¶ 24. The decision whether to grant a mistrial lies within the sound discretion of the trial court. *State v. Ross*, 2003 WI App 27, ¶ 47, 260 Wis. 2d 291, 659 N.W.2d 122, *review denied,* 2003 WI 91, 262 Wis. 2d 501, 665 N.W.2d 375 (Wis. June 12, 2003) (No. 02–0121–CR). The trial court must determine, in light of the whole proceeding, whether the claimed error was sufficiently prejudicial to warrant a new trial. *Id.* The denial of a motion for a mistrial will be reversed only on a clear showing of an erroneous use of discretion by the trial court. *Id.* Generally, an improper but unanswered question is not sufficient error to require reversal on appeal. *Genova v. State*, 91 Wis. 2d 595, 621, 283 N.W.2d 483 (Ct. App. 1979). Where the trial court gives the jury a curative instruction, this court may conclude that such instruction erased any possible prejudice, unless the record supports the conclusion that the jury disregarded the trial court's admonition. *Id.* at 622.

¶ 25. Upon this record, Piakowski's improper reference to Sigarroa's prior criminal history was not prejudicial enough to affect the verdict.[6] Sigarroa argues that the alternate juror's comment to the trial judge "proves that not only did the jury hear the comment, the contents of the comment registered . . .

---

[6] Detective Piakowski's testimony was an unquestionable violation of the trial court's in limine ruling and it is the catalyst for our decision to spend time at the end of this opinion admonishing this sort of conduct.

with them as well, illustrating the difficulty jurors have in disregarding such negative information regarding a defendant." Sigarroa further argues that the court's instruction failed to give the jury the correct information, which would be to disregard Piakowski's previous answer.

¶ 26. We conclude that the exchange between the trial judge and the alternate juror illustrates something quite different than what Sigarroa contends. The alternate juror's statements to the trial judge signal that this juror understood the judge's earlier ruling as forcefully striking Piakowski's improper testimony referencing Sigarroa's prior record. This, coupled with the judge's jury instruction at the close of testimony, was sufficiently curative.

■■■

¶ 27. Given our interpretation of the exchange between the alternate juror and the trial judge,[7] given the trial judge's instructions to the jury to ignore all things stricken, and given the overwhelming evidence against Sigarroa, we are satisfied that the trial court did not err in holding that the violation was not so prejudicial that it affected the verdict. Thus, the trial court did not err when it denied Sigarroa's request for a mistrial.

¶ 28. We do not end our discussion here. Instead, we are compelled to admonish the increasing pattern of witness and/or attorney violation of in limine orders. On several occasions, we have spent judicial time and resources to make a very similar admonition. Unfortu-

---

[7] We commend the trial judge for informing the parties and making a record of his encounter with the alternate juror.

nately, it appears our reproach has fallen on deaf ears because the pattern of these violations continues.[8]

---

[8] The following are merely a sampling of the many cases illustrating the continuing pattern of witness and/or attorney violations of in limine orders:

*Gainer v. Koewler, 200 Wis. 2d 113, 546 N.W.2d 474 (Ct. App. 1996)*: In *Gainer*, David M. and Dana M. Gainer claimed that their child, Justin R. Gainer, was the victim of negligence by two physicians involved in Justin's birth. *Id.* at 115. Prior to trial, the Gainers moved the trial court for an order that no mention be made at trial of the fact that David had been arrested and convicted of spousal abuse. *Id.* at 117. The trial court ordered that nothing be said without a hearing. *Id.* When Dana testified on direct examination, no mention was made of any marital problems caused by Justin's injuries. *Id.* at 117–18.

Nonetheless, on cross-examination, Koewler's attorney asked and Dana answered the questions about police contacts after the birth of Justin. *Id.* at 117–19. The questions also provoked a motion for a mistrial. *Id.* at 119.

Although we affirmed the trial court's denial of a mistrial, we expressed concerns about counsel's violation of the in limine order. *Id.* at 115–16. We wrote that a violation of an in limine order could be considered a breach of counsel's ethical obligation. *Id.* at 123. We noted that among the specific provisions of Wisconsin rules governing attorney professional conduct, SCR 20:3.4(c) states that a lawyer shall not:

> knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists.

*Gainer*, 200 Wis. 2d at 123.

We then urged trial courts to exercise greater control over trials in order to avoid these breaches. *Id.* at 122. Finally, we stated that our concerns were a warning shot across the bow of the profession. *Id.* at 124.

*Esser v. Myer, No. 95–1994, unpublished slip op. (Wis. Ct. App. Nov. 13, 1996)*: *Esser* addressed a claim of legal malprac-

¶ 29. We now reiterate the message of our previous admonitions; our objective is to raise the intensity

tice. *Id.* at 1. Within the appeal, we addressed Esser's claim that the jury should have been able to review an appraisal of a home that was a central part of her proof and referred to extensively during trial. *Id.* at 6.

We considered this claim "irksome" in light of the trial court's ruling on a motion in limine that the exhibit was inadmissible. *Id.* We noted that the record reflected that Esser violated the trial court's ruling by asking the bank loan officer about the value based on the appraisal. *Id.* We noted that Esser then had the "audacity" to suggest that the appraisal should be admitted because the bank officer had already testified to it. *Id.*

As did the trial court, we recognized Esser's conduct as "bootstrapping." *Id.* We then referred back to *Gainer*, noting that we had previously "stated our disdain for this type of trial tactic" and reiterated the need to impose some sanctions on litigants who violate motion in limine orders with the assumption that there is no associated risk. *Esser*, unpublished slip op. at 6.

*State v. Ragan, No. 96–0352–CR, unpublished slip op. (Wis. Ct. App. Jan. 22, 1997)*: Ragan appealed from a judgment of conviction for filing a false declaration of candidacy. *Id.* at 1. Prior to trial, the State filed a motion in limine seeking to exclude at trial any reference to the fact that Ragan had won the election but had not been seated for the position of town supervisor. *Id.* In support of its motion, the State argued that such evidence was inadmissible and that the jury might conclude that Ragan's loss of the position he had won in the election might be sufficient punishment. *Id.* The trial court agreed and granted the State's motion. *Id.*

Contrary to this ruling, a defense witness testified before the jury that Ragan had won the election. *Id.* at 2. The State moved for a mistrial. *Id.* The court granted the motion over Ragan's objection. *Id.*

*State v. English-Lancaster, 2002 WI App 74, 252 Wis. 2d 388, 642 N.W.2d 627, review denied, 2002 WI 48, 252 Wis. 2d 151, 644 N.W.2d 687 (Wis. Apr. 22, 2002) (No. 01–1455–CR)*:

of our delivery to an appellate shout:

> This is not the first time the court of appeals has been
> faced with [a violation of] an order keeping out preju-

English-Lancaster appealed from a judgment of conviction for second-degree sexual assault and an order denying his motion for postconviction relief. *Id.*, ¶ 1. English-Lancaster argued that the trial court should have declared a mistrial when a witness testified as to other acts evidence in violation of a pretrial court order to the contrary based upon a stipulation entered into by both English-Lancaster and the State. *Id.* English-Lancaster argued that the curative jury instruction provided by the court was insufficient to cure the error. *Id.*

English-Lancaster filed a motion in limine seeking to prohibit the State from introducing any evidence concerning alleged acts of criminal or other misconduct by the defendant either prior to or following the date of the alleged offense charged in the complaint. *Id.*, ¶ 4. At a motion hearing, defense counsel conceded that the State had not indicated that it would be introducing other acts evidence but he was concerned that the State's discovery materials alluded to allegations made by another individual which counsel believed could be prejudicial. *Id.* The prosecutor confirmed that the police had interviewed another person in connection with the investigation but advised the trial court that the State did not intend to introduce that witness's testimony as part of its case-in-chief. *Id.* The trial court then granted the defense's motion, stating, "Well, at least as to the state's case-in-chief, the court will grant the motion *in limine,* because it's been indicated there won't be other acts introduced." *Id.*

The trial then continued. *Id.*, ¶ 9. During the State's case-in-chief, the prosecutor called a police detective to the stand. *Id.* The detective testified that during his interview of English-Lancaster:

> I had asked, based upon my interview with [S.G.] and another
> employee where I was gathering a history of kind of the relation-
> ship between these employees, I had asked Mr. English-Lancaster

dicial material . . . . [W]e fear that this is happening with increasing frequency. The scenarios differ, but a

> if he had ever made comments of a sexual nature to [S.G.] and another employee, and he stated that he had not and that he always maintained a professional—he always remained professional at the work place.

*Id.*

The prosecutor then asked the detective whether he asked English-Lancaster any other questions about contact between him and the alleged victim. *Id.* The detective testified:

> Yes, I did. I had asked him if he had ever touched the buttocks of either [S.G.] or this other employee, and he responded "no." Which I then followed up with another question, which was would there be any reason why, when I'm reviewing the videotape surveillance, would there be any reason why I would see you touching the buttocks of either [S.G.] or this other employee. And he said he didn't know, and I asked him if that was a possibility, something that I may see on the video, and he said, "Yes, it's a possibility."

*Id.*, ¶¶ 9–10.

Shortly thereafter, during a court-initiated recess, defense counsel complained that the detective's testimony unwittingly violated the court's ruling on the motion in limine because it referred to English-Lancaster's alleged conduct toward another employee; defense counsel asked the court to instruct the jury to disregard that testimony. *Id.*, ¶ 10. The prosecutor indicated that he was unaware of the court's previous ruling (he had replaced the earlier prosecutor in the case) and the trial court agreed, "[T]here was going to be no mention of any other incidents." *Id.* The parties then discussed an appropriate curative instruction. *Id.* Defense counsel did not request a mistrial. *Id.*

*State v. Seefeldt, 2002 WI App 149, 256 Wis. 2d 410, 647 N.W.2d 894, aff'd, 2003 WI 47, 261 Wis. 2d 383, 661 N.W.2d 822:* Like *Gainer*, this case contained issues regarding attorney violation of a motion in limine order; however, here the defense attorney, rather than the prosecuting attorney, acted improp-

257

common thread seems to be that it happens in a jury case of some length. The suspect line of questioning is gone into when the trial is well underway. [In the case of attorney violation of in limine orders,] [i]t is almost as if the attorney takes the risk that the trial court will be more inclined to finish the trial than declare a mistrial due to prejudice. Thus, the jury hears the damaging evidence and the lawyer gets what he or she wants with little more than a rebuke from the trial court.

*Gainer v. Koewler*, 200 Wis. 2d 113, 121–22, 546 N.W.2d 474 (Ct. App. 1996).

¶ 30. We are convinced that the bar, and, particularly, the bench, should be aware of the increasing phenomenon of violations and should take measures designed to increase the risks to attorneys, witnesses, parties and/or any persons who have a role in violations of motion in limine orders. *See id.* at 122. In our unremitting effort to eliminate this conduct, we now offer the following suggestions to the trial courts—any of which, if employed, would go a long way in avoiding violations of motion in limine orders:

(1) Prior to trial, outside the presence of the jury, the court could address the attorney bound by the motion in limine order and get that

erly. *Seefeldt*, 256 Wis. 2d 410, ¶ 1. The trial court granted the State's request for a mistrial on the ground that defense counsel's reference to a witness's outstanding warrants violated a pretrial order prohibiting introduction of other acts evidence until the trial court ruled on its admissibility. *Id.* In addressing the appeal issues, we "assume[d] without deciding that counsel blatantly violated a pretrial order prohibiting any mention of other crimes or acts until the court had a chance to decide their admissibility." *Id.*

attorney's assurance that each and every witness has been instructed about the order;

(2) Prior to a pertinent witness testifying before the jury, the witness could be put on the stand, outside the presence of the jury, sworn, and then asked:

 a. if he or she is aware of the motion in limine order,

 b. if he or she understands what evidence is barred and,

 c. if he or she will abide by the court's order;

(3) Prior to the witness testimony, reduce the motion in limine order to writing and have a copy served upon each witness.

¶ 31. The practice of flouting motion in limine orders has become nearly epidemic. Trial courts must be proactive in order to end this flagrant misconduct. "[T]his court's warning shot across the bow, we hope, will help alert everyone in the legal profession that it is time for the judiciary to exercise more control." *Id.* at 124.

*By the Court.*—Judgment and order affirmed.