**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**October 30, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.**  **2023AP1273-CR**
**2023AP1274-CR**
**2023AP1275-CR**
**2023AP1276-CR**
**2023AP1277-CR**
**2023AP1278-CR**
**2023AP1279-CR**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 2018CF1097
2020CF361
2020CF395
2020CF602
2020CF604
2021CF329
2021CF330

**IN COURT OF APPEALS**
**DISTRICT IV**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DANIEL ROBINSON,

DEFENDANT-APPELLANT.

APPEALS from judgments and an order of the circuit court for Rock County: KARL HANSON, Judge. *Affirmed*.

Before Kloppenburg, Nashold, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   After a three-day jury trial, Daniel Robinson was convicted of two counts of misdemeanor battery, three counts of disorderly conduct, and sixteen counts of felony bail jumping.[1]   On appeal, Robinson advances several challenges to his convictions.   Robinson argues that the circuit court erroneously exercised its discretion in making the following pretrial and trial rulings: denying Robinson's motion to sever the bail jumping charges from the other charges for which he was tried, admitting video from a Ring doorbell and a recording of a phone call that Robinson made from jail, and denying Robinson's motion for a mistrial based on comments that the prosecutor made in closing argument.   Robinson further contends that because he was acquitted of one charge of disorderly conduct, his convictions for bail jumping predicated on that charge must be reversed.[2]   Robinson also argues judicial bias in sentencing based on comments that the court made while sentencing a different defendant on the same day that Robinson was sentenced.   Finally, Robinson contends that we should order a new trial in the interests of justice due to the cumulative effect of the argued errors.   For the reasons that follow, we reject Robinson's arguments and affirm.

---

[1] These appeals were consolidated for briefing and disposition by an order dated August 23, 2023, pursuant to WIS. STAT. RULE 809.10(3) (2023-24).   All references to the Wisconsin Statutes are to the 2023-24 version.

[2] Robinson also argues that reversal of these bail jumping convictions on this basis is a new factor entitling him to sentence modification.   We do not address this argument because, as we explain *infra*, we affirm the bail jumping convictions.   *See **Barrows v. American Fam. Ins. Co.***, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) (we need not address every issue when one is dispositive).   As a result, we do not discuss this new-factor argument further.

**BACKGROUND**

¶2     These consolidated appeals concern judgments of conviction and an order denying postconviction relief in seven cases charged in Rock County, three of which went to trial and four of which were subsequently resolved as part of a global plea agreement.  We provide a brief overview of the relevant facts here, and additional details as necessary in the discussion that follows.

¶3     In Rock County Case No. 2020CF361, Robinson was charged with one count of battery as an act of domestic abuse, one count of disorderly conduct as an act of domestic abuse, and four counts of bail jumping, all arising out of events that took place on March 21, 2020.  According to the criminal complaint, police responded to a call made by someone on behalf of A.B. after A.B. approached that person outside of a restaurant and asked for help.[3]  When police arrived, A.B. was crying, had a puffy and discolored eye, and told police that Robinson had hit her in the nose and eye and made threatening remarks.  At the time of this alleged offense and the others discussed below, Robinson was released on bond in a number of other cases, which required that he not commit new offenses or have contact with A.B.

¶4     In Rock County Case No. 2020CF395, Robinson was charged with one count of disorderly conduct as an act of domestic abuse and four counts of bail jumping, all arising out of events that took place on May 6, 2020.  The criminal complaint alleged that after police responded to a report of a disturbance, A.B. told police that Robinson had threatened to punch her.

---

[3] Pursuant to the policy underlying WIS. STAT. RULE 809.86, we refer to A.B. using initials that do not correspond to her actual name.

¶5      In Rock County Case No. 2020CF602, Robinson was charged with two counts of disorderly conduct as acts of domestic abuse, battery as an act of domestic abuse, and eight counts of bail jumping, all arising out of events that took place on July 4 and 5, 2020. The criminal complaint alleged that on the night of July 4, Robinson and A.B. were at A.B.'s friend's house. A.B. told Robinson that she wanted to leave and Robinson told her not to, and when A.B. did leave, Robinson chased her down the street. At around 4:00 a.m. on July 5, after A.B. returned to her friend's house, A.B. saw Robinson in his vehicle in front of the house. A.B. told Robinson that she no longer wished to be in a relationship with him. After A.B. walked onto the front porch of the residence, Robinson approached her from behind, grabbed her by her hair, dragged her off the porch, and threw her to the ground.

¶6      The State moved to join these cases for trial, and the circuit court granted the motion over Robinson's objection.[4] After the cases were joined, Robinson moved to sever the sixteen bail jumping charges from the six other charges. The court denied that motion.

¶7      Before trial, Robinson moved to exclude video from a Ring doorbell (the "Ring video" or the "video") that purported to show Robinson dragging A.B. by her hair and throwing her to the ground, conduct that formed the basis for one of the disorderly conduct charges and the battery charge in Case No. 2020CF602. The circuit court ruled that the Ring video was admissible. The State moved before trial to admit a recording of a phone call that Robinson made to A.B. while

---

[4] The State also moved to join a fourth case, in which the victim was someone other than A.B. The circuit court denied the State's motion for joinder as to this fourth case, which is not before us on appeal.

Robinson was in jail (the "jail call" or the "call"), which, according to the State, showed that Robinson attempted to intimidate A.B. to prevent her from testifying, and which the State sought to admit as relevant to show Robinson's consciousness of guilt.[5] The court ultimately ruled that the jail call was admissible. The Ring video and jail call were admitted into evidence and were played for the jury at various points during the trial.

¶8 During the prosecutor's closing argument, the prosecutor made a comment suggesting that Robinson's and A.B.'s relationship was one in which Robinson provided A.B. with food, clothing, and a place to stay in exchange for sex, a comment to which Robinson's counsel immediately objected. The circuit court sustained Robinson's objection, gave a cautionary instruction to the jury, and denied Robinson's motion for a mistrial.

¶9 The jury found Robinson guilty of all counts except for the disorderly conduct charge in Case No. 2020CF602 that was based on the July 4 incident in which Robinson was alleged to have chased A.B. down the street.

¶10 After the jury trial, Robinson resolved the four additional cases consolidated on appeal with a global plea agreement involving all seven cases. Pursuant to the plea agreement, Robinson pleaded guilty to the charges of intimidation of a witness as an act of domestic abuse, delivery of cocaine, second-degree recklessly endangering safety, and possession with intent to deliver cocaine. The remaining charges in those cases, as well as the charges in a number

---

[5] Based on the jail call, the State also moved to join a witness intimidation charge with the charges that were proceeding to trial. After a hearing, the circuit court denied that motion because it concluded that joining the witness intimidation charge would be too prejudicial given that, at the time of the hearing, the trial was less than ten days away.

5

of other cases, were dismissed and read in at sentencing. Robinson was sentenced on all seven cases to a total of 22 years of initial confinement and 21 years of extended supervision. Approximately an hour before Robinson's sentencing, while sentencing another, younger defendant, the circuit court invited that defendant to attend Robinson's sentencing, which the court stated the defendant would benefit from observing.

¶11    Robinson moved for postconviction relief. Robinson argued that the comments that the circuit court made while sentencing the other defendant demonstrated an appearance of bias, and that Robinson was entitled to a new sentencing hearing before a different judge as a result. Robinson further argued that his convictions must be reversed on the bail jumping charges that were predicated on the disorderly conduct charge for which he was acquitted. After holding a nonevidentiary hearing, the court denied Robinson's motion.

¶12    Robinson appeals.

## DISCUSSION

¶13    We address Robinson's arguments in chronological order based on when the facts relevant to each issue occurred during the circuit court proceedings.

### I. Robinson's motion to sever

¶14    As stated, multiple charges in three separate cases were joined for trial: in total, Robinson was tried for two counts of battery, three counts of disorderly conduct as acts of domestic abuse, and sixteen counts of bail jumping. Robinson argues that the circuit court erroneously exercised its discretion when it denied his motion to sever the sixteen bail jumping charges from the other charges.

¶15 WISCONSIN STAT. § 971.12(1) addresses joinder of crimes:

> Two or more crimes may be charged in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan.

Additionally, § 971.12(4) addresses the trial together of separate charges, stating, "The [circuit] court may order 2 or more complaints, informations or indictments to be tried together if the crimes and the defendants, if there is more than one, could have been joined in a single complaint, information or indictment."

¶16 When deciding whether severance of joined charges is appropriate,

> the [circuit] court must determine what, if any, prejudice would result due to a trial on the joined charges. The court must then weigh this potential prejudice against the interests of the public in conducting a trial on the multiple counts. This balancing of competing interests involves an exercise of discretion and a [circuit] court's determination will not be disturbed on appeal in the absence of an [erroneous exercise] of that discretion.

*State v. Bettinger*, 100 Wis. 2d 691, 696, 303 N.W.2d 585 (1981). "We will not find an [erroneous exercise] of discretion unless the defendant can establish that failure to sever the counts caused 'substantial prejudice' to [the defendant's] defense." *State v. Hoffman*, 106 Wis. 2d 185, 209, 316 N.W.2d 143 (Ct. App. 1982) (quoting *United States v. Werner*, 620 F.2d 922, 928 (2nd Cir. 1980)).

¶17 Pertinent here, when the State moved to join the cases, it argued that the cases could have been charged in the same complaint, that the cases involved the same victim, that the underlying offenses occurred within a relatively short period of time, that joinder would be in the public interest by obviating the need

for separate trials, and that joinder would prevent the victim from having to testify in separate trials. The State also argued that joinder was appropriate under the greater-latitude rule set forth in WIS. STAT. § 904.04(2)(b)1. because any of the offenses involving domestic abuse would be admissible as other-acts evidence in a trial for any of the other similar offenses. *See* § 904.04(2)(b)1. ("In a criminal proceeding alleging … domestic abuse … evidence of any similar acts by the accused is admissible, and is admissible without regard to whether the victim of the crime that is the subject of the proceeding is the same as the victim of the similar act."). The circuit court agreed with the State and granted the State's motion to join the cases.

¶18 After the cases were joined but before trial, Robinson moved to sever the sixteen bail jumping charges in the three cases from the underlying charges in those cases, arguing that "the sheer number of felony bail jumping charges alone is prejudicial." The circuit court denied Robinson's motion.

¶19 We begin by noting that it is the circuit court's denial of Robinson's motion to sever the bail jumping charges that Robinson challenges, and not the court's decision to grant the State's motion to join the cases. *See **Hoffman***, 106 Wis. 2d at 208 ("The issues of misjoinder and severance are analytically distinct."). We next explain why we reject Robinson's contention that the court erroneously exercised its discretion in denying Robinson's motion to sever the bail jumping charges.

¶20 In denying Robinson's motion to sever, the circuit court considered the fact that the same evidence necessary to prove the underlying offenses was also necessary to prove the bail jumping charges (the only additional evidence necessary for the bail jumping charges was that Robinson was on bond, that the

bond prohibited the alleged conduct, and that Robinson intentionally violated the bond condition, *see* WIS. STAT. § 946.49(1)).[6] The court determined, as a result, that severing the bail jumping charges would not promote judicial economy or efficiency, and that it would require the victim to testify in separate trials that would be largely redundant. Although the court recognized that the number of bail jumping charges created "a potential for prejudice," the court determined that any potential for prejudice could be adequately addressed with a jury instruction. Weighing all of these considerations, the court determined that severance was not appropriate.

¶21 Robinson has failed to show an erroneous exercise of discretion: the circuit court properly weighed the potential prejudice from trying the bail jumping charges with the underlying charges against the public interest in conducting a single trial for all of the charges. *See Bettinger*, 100 Wis. 2d at 696. Further, the court instructed the jury three different times that each charge was for a separate crime and must be considered separately, and also that the jury's verdict on one count must not affect its verdict on another: "You must make a finding as to each count of the amended information in these cases. Each count charges a separate crime, and you must consider each one separately. Your verdict for the crime charged in one count must not affect your verdict on any other count." *See*

---

[6] Some of the bail jumping charges were based on Robinson's violation of bond by committing new crimes, and some were based on Robinson's violation of bond by having contact with A.B. The circuit court determined as a general matter that the evidence regarding the underlying offenses would be admissible in a separate trial regarding the bail jumping charges, without distinguishing between the two bases for those charges. On appeal, Robinson does not challenge or dispute the court's determination, on the basis of this distinction or otherwise, and we do not address it further.

*Hoffman*, 106 Wis. 2d at 213 (stating that the danger of prejudice arising from the joinder of multiple charges can be overcome by a proper cautionary instruction).

¶22 Robinson argues that the sheer number of the bail jumping charges, as well as the almost three-to-one ratio of bail jumping charges to underlying charges, resulted in prejudice. However, the circuit court considered the prejudice arising from the number of bail jumping charges and determined that other factors outweighed that prejudice, in addition to giving jury instructions that, as noted, overcome such prejudice. Robinson provides no legal authority to support the proposition that, as a matter of law, the sheer number of bail jumping charges—either viewed in isolation or in comparison to the number of underlying charges—results in substantial prejudice such that not severing the bail jumping charges from the underlying charges constitutes an erroneous exercise of discretion.

¶23 Robinson also argues that the fact that the jury found Robinson not guilty of one of the disorderly conduct charges but guilty of the bail jumping charges arising from that charge is evidence that Robinson was prejudiced by trying the charges together. However, this argument is speculative, and we reject it on that basis. As we discuss below, the fact that Robinson was acquitted on the underlying disorderly conduct charge but convicted on the associated bail jumping charges does not mean that Robinson was prejudiced under the circumstances here.

¶24 In sum, Robinson has not shown that the circuit court erroneously exercised its discretion in denying his motion to sever.

## II. *The circuit court's evidentiary rulings*

¶25 Robinson argues that the circuit court erroneously exercised its discretion when it admitted into evidence the Ring video and the jail call. We review a circuit court's evidentiary rulings for an erroneous exercise of discretion. *Martindale v. Ripp*, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698. The circuit court has broad discretion in making evidentiary rulings, which we will uphold "if the circuit court examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion." *Id.* Addressing each evidentiary ruling in turn, we conclude that the court did not erroneously exercise its discretion by admitting into evidence the Ring video or the jail call.

### A. *Ring video*

¶26 Before trial, Robinson filed a motion in limine to exclude what he described as an "iPod recording of [A.B.'s] cell phone recording of what [A.B.] claims is a video from a [R]ing doorbell showing Mr. Robinson dragging her off of a porch." As grounds for exclusion, Robinson argued that "[t]he video is blurry, and does not have any date or time stamp on it." The video, 19 seconds long, shows a man exiting the door of an enclosed porch, dragging a woman out by her hair, and throwing her to the ground as she screams at him to "stop." As stated, the conduct reflected in the Ring video formed the basis for one of the disorderly conduct charges and one of the battery charges.

¶27 At an evidentiary hearing on Robinson's motion, A.B. testified that on July 5, 2020, she reported to a Beloit police officer that Robinson had physically assaulted her. She testified that she showed the officer a video of the assault, which was a recording on her sister's cell phone of video from a Ring

doorbell camera that belonged to Vicky Hamilton, a friend of A.B.'s mother, and that the officer recorded the video from the phone. A.B. also testified that the video depicted her and Robinson and the assault that occurred.

¶28     Hamilton testified at the hearing to the following. She had a Ring doorbell, she was familiar with how it worked, and she described how she retrieved the video from the doorbell. Hamilton recognized A.B. in the video from the sound of A.B.'s voice and based on what A.B. was wearing, but Hamilton did not know whether it was Robinson in the video because she "never knew him" and had "[n]ever really ever seen his face." Hamilton testified that either A.B., A.B.'s sister, or A.B.'s mother recorded the video from the doorbell using one of their phones.

¶29     The police officer to whom A.B. showed the recording of the Ring video testified at the hearing that he spoke with A.B. on the evening of July 5, 2020, after A.B. came to the Beloit Police Department to report that she had been assaulted by Robinson, and that A.B. showed the officer the video depicting the assault. He testified that the video was on a cell phone, and that he recorded the video onto his department-issued iPod. The officer identified the man in the video as Robinson.

¶30     After testimony, Robinson argued at the hearing that the Ring video's probative value was substantially outweighed by the risk of unfair prejudice.[7] The circuit court disagreed and ruled that the video was admissible.

---

[7] Robinson raised a number of additional arguments as to why the Ring video should not be admitted, which we do not discuss because Robinson does not adequately renew these arguments on appeal.

¶31  At trial, the Ring video was admitted into evidence and played for the jury twice during the presentation of evidence.  The first time was during A.B.'s testimony.  A.B. testified that the video accurately depicted the incident on July 5 and showed Robinson dragging her off the porch.  The video was also played, without audio, during the testimony of the police officer to whom A.B. showed the video.  The officer testified, consistent with his testimony at the evidentiary hearing, that he spoke to A.B. when he "took a report for a battery and disorderly conduct," and that he recorded the video, which was shown to him on a cell phone, onto his department-issued iPod.  The officer testified that the video showed A.B. and Robinson, and that A.B. told the officer that while she was at a friend's house after she and Robinson had been arguing earlier in the night, Robinson came up from behind her and threw her off the porch.[8]

¶32  Robinson argues that the circuit court erroneously exercised its discretion when it admitted the Ring video because the video's probative value was substantially outweighed by the danger of unfair prejudice.  *See* WIS. STAT. § 904.03 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ….").  Robinson's arguments are unpersuasive.

¶33  First, Robinson argues that the Ring video had "incredibly low" probative value, and that it "is of such a poor quality that it is indicative of virtually nothing."  In particular, Robinson appears to suggest that because of the video's quality, it is not possible to recognize either Robinson or A.B.  The video,

---

[8] Hamilton also testified at trial regarding the contents of the Ring video, but the Ring video was not played during Hamilton's testimony.

which is a recording of a recording, is in black and white, and not high-quality. However, as stated, the video shows a man exiting Hamilton's enclosed porch, dragging a woman out of the porch by her hair, and throwing her to the ground as she screams at him to "stop," and at trial, A.B. testified that it accurately depicted what occurred on July 5. In his appellant's brief, Robinson does not argue that A.B.'s testimony was not sufficient to authenticate the video.[9] And otherwise, Robinson does not develop an argument as to why, given A.B.'s testimony regarding what the video depicted, the video's quality alone results in it having low probative value. The video was highly probative because it was relevant to two of the charges on trial—namely, whether Robinson had committed misdemeanor battery and disorderly conduct as acts of domestic abuse. *See State v. Walters*, 2004 WI 18, ¶31, 269 Wis. 2d 142, 675 N.W.2d 778 ("Probative value is a product of relevance and an assessment of what the evidence is likely to add to the case."); *see also State v. Payano*, 2009 WI 86, ¶81, 320 Wis. 2d 348, 768 N.W.2d 832 ("Essentially, probative value reflects the evidence's degree of relevance. Evidence that is highly relevant has great probative value, whereas evidence that is only slightly relevant has low probative value.").

¶34    Second, Robinson argues that the Ring video was unfairly prejudicial because of the number of times it was played for the jury. Before trial, in response to the prosecutor's stated intention to play the video four times, Robinson argued that to do so would be cumulative and prejudicial, and, after his

---

[9] In his reply brief, Robinson asserts in a cursory fashion that "the State fails to demonstrate how the video met the standards for admissibility regarding authentication and best evidence." However, in his appellant's brief, Robinson did not challenge the circuit court's ruling based on the video's authenticity or the best-evidence rule. Accordingly, we do not consider these arguments. *See State v. Mata*, 230 Wis. 2d 567, 576 n.4, 602 N.W.2d 158 (Ct. App. 1999) (stating that we need not address issues raised for the first time in a reply brief).

motion to exclude the video was denied, he asked the circuit court to exercise its discretion by limiting how many times the State could play the video. The court, recognizing that "there is a potential for the prejudicial effect of the video being played multiple times," ruled that it would limit the extent to which the State could play the video.

¶35   Consistent with the circuit court's ruling, at trial the video was played twice during the presentation of evidence: first, with audio, while A.B. testified, and second, without audio, while the police officer to whom A.B. reported the assault testified. The prosecutor also played the video during closing argument. Finally, the video was played again for the jury after the jury requested to view it during deliberations. After the jury's request, the video was first played with sound for the whole jury, and then without sound for individual groups of three jurors at a time, which was done so that the jurors could view the video from a close vantage point while maintaining social distancing due to the COVID-19 pandemic. Robinson did not object to the manner in which the video was shown to the jury in response to the jury's request to view it, and the court's decision to play the video without audio for the separate groups of jurors was consistent with how Robinson requested that the video be played for the jury upon the jury's request.

¶36   The video was undoubtedly prejudicial in that it showed Robinson dragging A.B. by her hair and throwing her to the ground. However, as the State points out, Robinson does not develop an argument as to how the video and the number of times it was played were *unfairly* prejudicial or how any unfair prejudice *substantially* outweighed the video's high probative value. *See **State v. Murphy**, 188 Wis. 2d 508, 521, 524 N.W.2d 924 (Ct. App. 1994) ("By its very nature, nearly all evidence operates to the prejudice of the party against whom it is

15

offered. The test is whether the resulting prejudice of relevant evidence is fair or unfair." (citation omitted)). Accordingly, we reject Robinson's assertion that he was unfairly prejudiced as unsupported.

*B. Jail call*

¶37 Three weeks before trial, the State moved to admit the jail call, which the State argued was relevant because it showed Robinson's consciousness of guilt. The relevant part of the jail call was transcribed as follows:[10]

> Robinson: Them people ain't trying to call you or nothing like that?
>
> Female: Huh?
>
> Robinson: Them people ain't trying to get ahold of you? March 1st I go back to uh court again.
>
> Female: Uh huh.
>
> Robinson: When they tried to get a hold of you?
>
> Female: Who?
>
> Robinson: I just asked you, I said are them people trying to get a hold of you again? Yeah.
>
> Female: Wait, you said. Who is trying to get ahold of me?
>
> Robinson: Uh, any investigators or anything for court?
>
> Female: Uh huh (meaning no).

---

[10] Robinson does not cite to the recording of the jail call itself in the record of any of the cases consolidated on appeal, and the State notes in its respondent's brief that it could not locate the recording in the record of any of the consolidated cases. We likewise have not located the recording of the jail call in the record, and we rely on the transcript of the jail call that is in the record.

Robinson: How you feel about that, you still leaving that shit alone and stuff. You still ain't going.

Female: Huh?

Robinson: How do you feel about that, you still leaving that shit alone? You still not going?

Female: I haven't said. Nobody call me ain't nobody talk to me. I ain't talk to nobody. So. I'm not gonna be not gonna be. I have so much stuff going on.

Robinson: Well, thank you for not coming. Thank you for not going.

Female: Okay. What?

Robinson: I said thank you for not coming, thank you for not going.

¶38 At a hearing on the State's motion to admit the jail call, Robinson argued that the call's probative value was substantially outweighed by the danger of unfair prejudice because the call would reveal that Robinson was in jail and because of how close to trial the State was seeking to admit the jail call. The circuit court stated that if the recording was admitted into evidence, it would not be possible to provide the necessary foundation without revealing that Robinson made the call from jail. Accordingly, the court ruled that the recording itself, as well as foundational testimony from an investigator for the Rock County District Attorney's Office who listened to the recorded call, was not admissible. However, the court also ruled that A.B. could testify regarding the jail call if she was able to do so without revealing that Robinson was in jail when he made the call.

¶39 On the first day of trial, the State asked the circuit court to reconsider its ruling regarding the jail call. The State explained that it had a recording of the jail call and a corresponding transcript, neither of which included the part of the call in which Robinson identifies himself as an inmate at the Rock

17

County Jail, and, consistent with the court's prior ruling, the State argued that A.B. could testify that the call was recorded without stating why. The State further argued that the jail call would be admissible in the event that the defense attacked the credibility of A.B., who it was anticipated would testify about the jail call. The court again determined that the jail call was inadmissible but ruled that the call could be admissible if Robinson were to attack the credibility of A.B.

¶40 After Robinson's counsel attacked A.B.'s credibility in opening statements, the circuit court determined that the excerpt of the jail call that omitted the portions showing that Robinson was in jail was admissible to show Robinson's consciousness of guilt, and that the risk of unfair prejudice did not substantially outweigh its probative value.

¶41 The jail call was played for the jury on three separate occasions. The first time was during A.B.'s testimony, after A.B. testified about what Robinson said during the call and that the call was recorded. The second time was during the testimony of an investigator for the Rock County District Attorney's Office, who testified that he listened to the recorded call.[11] The third and final time the jail call was played was during the State's closing argument. At no time that the jail call was played was any reference made to Robinson's incarceration, nor does Robinson argue that it was ever mentioned during trial that he made the call while in jail.

---

[11] During the investigator's testimony, a transcript of the jail call was admitted into evidence and read to the jury.

¶42    Robinson argues that the circuit court erroneously exercised its discretion in admitting the jail call because the jail call was needlessly cumulative and unfairly prejudicial.[12]  We disagree.

¶43    In support of his first argument, Robinson argues that the jail call was needlessly cumulative because the State "could have … presented evidence about the call[] without playing the audio recording[] numerous times, rendering the evidence unnecessary and cumulative."  *See* WIS. STAT. § 904.03 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed … by considerations of … needless presentation of cumulative evidence.").  However, as the State argues, playing the jail call was not needlessly cumulative because it corroborated A.B.'s testimony as to what Robinson said during the jail call after A.B.'s credibility was attacked.  *See* ***State v. Huntington***, 216 Wis. 2d 671, 696, 575 N.W.2d 268 (1998) (concluding that testimony corroborating the victim's testimony was not "'needless presentation of cumulative evidence'" when the defense had attacked the victim's credibility (quoting § 904.03)); ***State v. White***, 2004 WI App 78, ¶21, 271 Wis. 2d 742, 680 N.W.2d 362 (concluding that the probative value of evidence corroborating witness testimony was not substantially outweighed by the needless presentation of cumulative evidence, even though the evidence was "'cumulative' in a technical sense").  Accordingly, Robinson's argument that the jail call was needlessly cumulative is without merit.

---

[12]    At times in Robinson's briefs, he refers to "calls" in the plural.  However, although the State at one point also moved to admit other calls that Robinson made from jail, only one call—the jail call that we have described—was ultimately admitted, and it is only that call that is at issue here.

¶44    As to Robinson's second argument, Robinson contends that the jail call was prejudicial for two reasons.  First, Robinson argues that the jury would have inferred that Robinson was in jail because the call was recorded, the investigator for the State testified that he listened to the call, and there were no additional bail jumping charges arising out of the call despite an order, which the jury was aware of, that Robinson not have any contact with A.B.  Second, Robinson argues that the jail call was prejudicial because the State sought to admit the call "just prior to trial."  Robinson's arguments are unpersuasive.

¶45    First, we are not convinced that the jury would have surmised that Robinson was in jail based on the facts that Robinson identifies, particularly given that the circuit court did not admit those portions of the call that showed that Robinson was in jail, nor did the court permit testimony that Robinson was in jail. Second, although Robinson argues that the jail call was given to the defense "in the moments leading up to trial," as previously noted, the State first sought to admit the jail call three weeks before trial.

¶46    Further, Robinson generally asserts that the jail call was "prejudicial," but he does not develop an argument based on the relevant legal standard: whether the jail call's probative value was substantially outweighed by the asserted prejudice.  *See Clean Wis.*, 282 Wis. 2d 250, ¶180 n.40 (we generally do not address undeveloped arguments).  For example, Robinson does not challenge the State's argument that the jail call was probative because it corroborated A.B.'s testimony about the substance of the jail call (which, as noted, the circuit court determined was relevant to show Robinson's consciousness of guilt, a determination that Robinson does not challenge on appeal).  Accordingly, Robinson's arguments do not persuade us that it was an erroneous exercise of

20

discretion for the court to determine that the probative value of the jail call was not substantially outweighed by the danger of unfair prejudice.

¶47 Finally, the State argues that any error in admitting the jail call was harmless. Specifically, the State argues that even if the recording of the jail call was not admitted, the same information would have been introduced through the testimony of A.B. and the State's investigator (which Robinson does not challenge), and there is thus no reasonable possibility that Robinson would have been acquitted if the jail call was excluded. *See **Martindale***, 246 Wis. 2d 67, ¶¶30, 71 (stating that an erroneous exercise of discretion only leads to a new trial if there is a reasonable possibility that the error contributed to the outcome).

¶48 In his reply brief, Robinson does not address the State's argument predicated on the absence of a reasonable possibility that any error contributed to the outcome. Rather, Robinson argues that the State's argument regarding harmless error "runs afoul [of] the idea of cumulative evidence." However, Robinson does not otherwise develop this argument, and as we have explained, the jail call was not needlessly cumulative because it corroborated A.B.'s testimony about the substance of the phone call. Robinson also argues that admission of the jail call was not harmless error because "the jury heard, over and over, inflammatory and prejudicial evidence about the [jail] call[]." However, as stated, the jail call was played three times over the course of a three-day jury trial, and Robinson does not explain, nor do we discern, how the jail call could be considered "inflammatory."

21

### III. Robinson's motion for mistrial based on the prosecutor's comments in closing argument

¶49     Robinson argues that the circuit court erroneously exercised its discretion in denying his motion for a mistrial based on the comments the prosecutor made during closing argument. Specifically, the prosecutor told the jury:

> The background that you heard about the relationship [between Robinson and A.B.] I think is important. When [Robinson's counsel] made her opening statement, she painted a picture of someone who was, you know, just doing the right thing, that [Robinson] was helping [A.B.] with her food and clothing, a place to stay. [Robinson's counsel] left out the part, however, that as an exchange for all that, [A.B.] would have to have sex with someone who was 30 years older than she was and she would have to put up with repeated instances of physical abuse, stalking, and controlling[.]

At that point Robinson's counsel objected. Outside the presence of the jury, Robinson's counsel argued that "the statement from the State that food and clothing was predicated on sex or sexual favors never came out at trial." The court agreed and ruled "that there was no testimony … that would lead to a reasonable inference that sex was given in exchange or demanded in exchange for such items."

¶50     Accordingly, the circuit court sustained Robinson's objection and gave a cautionary instruction to the jury:

> Ladies and gentlemen, there was an objection to [the prosecutor's comment] during the closing arguments here. That objection I sustained. The objection was related to certain comments about sex and the comment was improper. There's no evidence before this jury that has been produced during this trial that would indicate that there was such quid pro quo, and the jury should entirely disregard any statement that may have made such an allegation or inference.

22

¶51    Before the circuit court gave this instruction to the jury, Robinson's counsel moved for a mistrial, which the court denied. The court explained:

> I do find that the jury is presumed to follow the instructions that are given by the [c]ourt. I find that a cautionary instruction in this instance, particularly when I believe that there was no evidence adduced at trial that would support the statement, will be sufficient to ensure that the jury does not consider that in the course of their deliberations.

As stated, Robinson argues that the court's ruling constitutes an erroneous exercise of discretion. We reject this argument.

¶52    The Constitution does not guarantee an error-free trial. *United States v. Hasting*, 461 U.S. 499, 508-09 (1983). "[N]ot all errors warrant a mistrial and 'the law prefers less drastic alternatives, if available and practical.'" *State v. Adams*, 221 Wis. 2d 1, 17, 584 N.W.2d 695 (Ct. App. 1998) (quoting *State v. Bunch*, 191 Wis. 2d 501, 512, 529 N.W.2d 923 (Ct. App. 1995)). Whether to grant a mistrial lies within the sound discretion of the circuit court. *State v. Doss*, 2008 WI 93, ¶69, 312 Wis. 2d 570, 754 N.W.2d 150. "The [circuit] court must determine, in light of the whole proceeding, whether the claimed error was sufficiently prejudicial to warrant a new trial. The denial of a motion for mistrial will be reversed only on a clear showing of an erroneous use of discretion by the [circuit] court." *State v. Ross*, 2003 WI App 27, ¶47, 260 Wis. 2d 291, 659 N.W.2d 122 (citation omitted).

¶53    Here, the basis for Robinson's motion for a mistrial was the prosecutor's comment regarding the nature of Robinson's relationship with A.B. "A prosecutor's closing argument is improper when it so infects the trial with unfairness as to make the conviction a denial of due process." *Adams*, 221 Wis. 2d at 19. Although a prosecutor "may comment on the evidence, detail the

evidence, argue from it to a conclusion, and state that the evidence convinces him or her and should convince the jurors," the prosecutor may not "suggest that the jury arrive at its verdict by considering factors other than the evidence." *Id.* Whether the prosecutor's conduct affected the fairness of the trial is determined by viewing the prosecutor's statements in the context of the entire trial. *State v. Neuser*, 191 Wis. 2d 131, 136, 528 N.W.2d 49 (Ct. App. 1995). "When a circuit court gives a proper cautionary instruction, appellate courts presume that the jury followed that instruction and acted in accordance with the law." *State v. Gary M.B.*, 2004 WI 33, ¶33, 270 Wis. 2d 62, 676 N.W.2d 475.

¶54   Robinson fails to show that the circuit court erroneously exercised its discretion by denying his motion for a mistrial. To be sure, the prosecutor's comments were improper in that the prosecutor suggested that A.B. had sex with Robinson in exchange for food, clothing, and a place to stay, which was not supported by the evidence at trial. *See Adams*, 221 Wis. 2d at 19; *see also Neuser*, 191 Wis. 2d at 139 ("A prosecutor's interest is not to 'win a case, but [to see] that justice shall be done.' While a prosecutor 'may strike hard blows, [the prosecutor] is not at liberty to strike foul ones.'" (first alteration in original; quoted source omitted)). However, the prosecutor's comment was a single remark over the course of a three-day trial, Robinson's counsel immediately objected to the prosecutor's comment, and the court instructed the jury not to consider the prosecutor's comment because no evidence had been presented at trial to support it.

¶55   Further, in addition to the circuit court's specific instruction regarding the prosecutor's comment, before the parties' closing arguments, the jury was also generally instructed, "Remarks of the attorneys are not evidence. If the remarks suggest certain facts not in evidence, disregard the suggestion." The

jury was also instructed to "consider … carefully the closing arguments of the attorneys, but their arguments and conclusions and opinions are not evidence. Draw your own conclusions from the evidence, and decide upon your verdict according to the evidence, under the instructions given you by this [c]ourt." As stated, the jury is presumed to have followed the court's instructions. *See M.B.*, 270 Wis. 2d 62, ¶33.

¶56    In sum, we conclude that Robinson fails to show that the circuit court erroneously exercised its discretion in denying his motion for a mistrial.

### IV.  Sufficiency of the evidence for bail jumping convictions

¶57    Three of the bail jumping charges against Robinson were predicated on Robinson's violation of a bond condition in each of three prior cases requiring that he not commit a new crime while on bond—specifically, the State alleged that he committed the crime of disorderly conduct as an act of domestic abuse on July 4, 2020.[13]  The jury found Robinson guilty of the three bail jumping charges, but not of the underlying disorderly conduct charge.  Robinson argues that because he was acquitted of the underlying disorderly conduct charge, there is insufficient evidence to support the bail jumping convictions.  *See* WIS JI—CRIMINAL 1795 (stating that when a defendant is charged with violating a condition of bond requiring that the defendant not commit any crime, the State must prove beyond a reasonable doubt that the defendant committed the alleged crime).

¶58    Robinson's argument is squarely foreclosed by our decision in *State v. Rice*, 2008 WI App 10, 307 Wis. 2d 335, 743 N.W.2d 517.  There, Rice was

---

[13] Robinson was charged with the bail jumping charges at issue, and the disorderly conduct charge out of which they arose, in Rock County Case No. 2020CF602.

convicted of bail jumping for violating a condition of his bond by committing a burglary, but he was acquitted of the underlying burglary charge. *Id.*, 307 Wis. 2d 335, ¶¶3, 10, 25. As a result of the acquittal, Rice argued that there was insufficient evidence to support his conviction on the bail jumping charge. *Id.*, ¶25. We rejected his argument, relying on the Supreme Court's decision in *United States v. Powell*, 469 U.S. 57 (1984). We quoted the following language from *Powell*:

> [I]nconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense….
>
> Inconsistent verdicts therefore present a situation where "error," in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course.

*Rice*, 307 Wis. 2d 335, ¶26 (quoting *Powell*, 469 U.S. at 65). We also quoted the *Powell* court as holding that "sufficiency of the evidence review was 'independent of the jury's determination that evidence on another count was insufficient[]' and therefore was not a basis for overturning Powell's conviction." *Rice*, 307 Wis 2d 335, ¶26 (alteration in original) (quoting *Powell*, 469 U.S. at 67). Accordingly, we concluded in *Rice*:

> The same rationale applies here. In order to convict on the bail jumping charge the jury had to find all the elements of the … burglary and the additional elements of bail jumping. The jury convicted Rice of bail jumping, which is inconsistent with its verdict acquitting him of the

… burglary. However, under *Powell*, this is permissible since we do not know whether the State or Rice received the benefit of the inconsistent verdict. The only question is whether there was sufficient evidence on which a jury could find all the elements of the … burglary. Rice does not argue the evidence was lacking in this regard.

*Rice*, 307 Wis 2d 335, ¶27 (citations omitted).

¶59 We are bound by *Rice*, and the rationale from *Powell* that we applied in *Rice* also applies here: the jury's inconsistent verdicts are permissible, and "[t]he only question is whether there was sufficient evidence on which a jury could find all the elements of" the disorderly conduct charge underlying the bail jumping charges. *Rice*, 307 Wis. 2d 335, ¶27.[14]

¶60 In response to the State's reliance on *Rice*, Robinson argues in his reply brief that there was insufficient evidence to find that he committed the

---

[14] In arguing that there was insufficient evidence to support the bail jumping convictions, Robinson cites *State v. Hansford*, 219 Wis. 2d 226, 580 N.W.2d 171 (1998). However, as the State points out, in *State v. Rice*, 2008 WI App 10, 307 Wis. 2d 335, 743 N.W.2d 517, the defendant similarly relied on *Hansford*, and we rejected that argument because *Hansford* is distinguishable in that it "did not involve inconsistent verdicts by the same jury, as in *Powell*." *Rice*, 307 Wis. 2d 335, ¶¶28-29. As we explained in *Rice*:

> [T]he underlying charge in *Hansford*, obstructing an officer, was tried to a jury. Hansford waived his right to a jury trial on the bail jumping charge and stipulated that he was on bond at the time of the underlying offense. After the jury convicted him of obstructing, the court found him guilty of bail jumping, relying on his obstructing conviction and his stipulation. The supreme court reversed the obstructing conviction on an unrelated ground, and held that because the obstructing charge was reversed, there was no longer sufficient evidence to support Hansford's bail jumping conviction.

*Id.*, ¶28 (citations omitted). Accordingly, in *Rice* we concluded that *Hansford* "did not set out any exception to *Powell*, or even address the same question." *Rice*, 307 Wis. 2d 335, ¶29. Because this case involves the same issue as that presented in *Rice*, Robinson's reliance on *Hansford* is equally unavailing.

underlying offense of disorderly conduct. As the State argues, A.B. testified to the following facts that support the disorderly conduct charge. On the night of July 4, A.B. wanted to watch fireworks with her mother or her friend, but Robinson did not want her to go and told her not to try to leave. After A.B. left, Robinson chased A.B. down the street while A.B. was on the phone with her mother, and Robinson took the phone from A.B. and screamed into the phone, telling A.B.'s mother that she was "going to listen as your daughter get[s] her ass beat." This evidence is sufficient to support the predicate offense of disorderly conduct. WIS JI—CRIMINAL 1900 (listing the elements of disorderly conduct as being first, that "[t]he defendant engaged in (violent) (abusive) (indecent) (profane) (boisterous) (unreasonably loud) (or otherwise disorderly) conduct," and second, that "[t]he conduct of the defendant, under the circumstances as they then existed, tended to cause or provoke a disturbance").

¶61    Robinson argues that some of A.B.'s testimony was uncorroborated and that "her impeachment on cross-examination made her testimony regarding this incident wholly incredible," but Robinson identifies only a single inconsistency between A.B.'s testimony on direct examination and her testimony on cross-examination, regarding whether Robinson took the phone out of her hands.

¶62    Accordingly, Robinson has failed to show that the evidence was insufficient to support the jury's guilty verdict on the bail jumping charges.

*V. Judicial bias at sentencing*

¶63    Robinson argues that the circuit court judge was biased against him at sentencing and that he is therefore entitled to resentencing before a different judge. In support, Robinson relies on comments that the court made while

sentencing a different defendant in a separate case, comments that Robinson argues demonstrate judicial bias.

¶64 At an earlier hearing on the morning that Robinson was sentenced, the circuit court sentenced Steffon Carter. Carter, who was 22 years old, was sentenced for battery and criminal damage to property as acts of domestic abuse. At Carter's sentencing hearing, the court stated:

> If I had you sit here in court, Mr. Carter, over the course of a day or a week, I could show you men who are in their 30s, their 40s, their 60s, and their 70s, in fact, I'm sentencing one at 10 o'clock today [and] … it would be to your benefit to be sitting in the back of the room during that hearing because you're at a point where you can make some change here and you can try to understand what it means to respect others and you can take a look at what it is when somebody goes through life without respect for other people. And it's a very lonely existence, and it's one that usually involves wearing orange and sitting in the chair that you're in right now.
>
> If that's where you want to be in your 50s, that's a choice you can make, but it's going to be a really, really bumpy road and it's not going to be a pleasant one for you or for the people that you victimize along the way….

After sentencing Carter, the court stated:

> I'm not sure that the jail can orchestrate it or they have the ability to do it, but if they do, Mr. Carter, I'm inviting you to come back to court at 10 o'clock today to sit in the back [in] one of those brown chairs, if the jail has availability for it, because I think it would be to your benefit to hear the sentencing hearing for someone who is about 50 years old and he has not heeded the changes along the way and is facing sentencing for conduct that started in circumstances incredibly similar to yours and simply just never learned that lesson. If they're able to orchestrate that, I'd like to have you listen to that sentencing hearing today at 10:00. If not, we'll hope that you're going to be able to gain all the lessons you need on your own. Good luck, Mr. Carter.

29

Robinson filed a postconviction motion, arguing, as he does on appeal, that these comments demonstrate judicial bias because "they would lead a reasonable person to believe that the [circuit court] had made up its mind before Mr. Robinson's sentencing hearing as to what the outcome would be," namely, a "lengthy sentence."

¶65     At the hearing on Robinson's motion, the circuit court explained that it had frequently, without using Robinson's name, used him as an example when sentencing other defendants because Robinson, "after some issues early on in life building up a criminal record," had "d[one] really well," and had a good job, a good home, and a good relationship with his children, and had found a partner he cared about.   But, the court explained, "things started going downhill pretty quickly, and whether it was a matter of wanting more and finding the easy way to get it or simply not showing respect for others that they're entitled to, … you put everything, all that good progress in jeopardy."   The court thus used Robinson as an example of "what happens if you don't have enough respect for yourself and respect for others to do things the right way, the hard way.  And if you go the easy route, the things that you can lose."   The court stated that its intent "was to show Mr. Carter that progress is hard.  It can be achieved, but it can be lost quickly."

¶66     The circuit court additionally stated at the postconviction hearing that at the time that it was sentencing Carter, it had "read the presentence investigation" for Robinson's sentencing.  The court explained:

> I knew that there was going to be some significant discussion about your history in the course of your sentencing hearing.  I knew there was going to be discussion about the good, the bad, and the otherwise.  I knew that the State would certainly highlight your prior criminal record.  I knew that your attorneys … would highlight the years of good things that you had done and

how hard you had worked to build that up. And I knew that ultimately we would come to the point of discussing how you threw all of that away ….

The court further explained:

I don't believe that anything in that transcript, in isolation or in its entirety, demonstrates that the [c]ourt was intending to give you a lengthy sentence or was intending to show off to Mr. Carter by imposing a lengthy sentence to impress that upon him. I think the fact of simply seeing someone who had a rocky start but then did well and lost it again, and by lost it, I mean lost the idea of respect, lost the things that he had gained in the community, I think that is enough to hopefully inspire change for someone like Mr. Carter or others.

It's not about the numbers.… The idea simply is that it's hard to build things back up later in life. It's easier to do it now when you're young, and that if you're not careful, if you don't internalize that respect for yourself and for others, you can quickly lose all the good things you do build up in life.

Accordingly, the court concluded that its statements at Carter's hearing did not demonstrate bias.

¶67    "The right to an impartial judge is fundamental to our notion of due process." *State v. Goodson*, 2009 WI App 107, ¶8, 320 Wis. 2d 166, 771 N.W.2d 385. "We presume that a judge has acted fairly, impartially, and without bias. To overcome that presumption, the burden is on the party asserting judicial bias to show bias by a preponderance of the evidence." *Miller v. Carroll*, 2020 WI 56, ¶16, 392 Wis. 2d 49, 944 N.W.2d 542 (citations omitted). Whether a judge was biased is a question of law that we review independently. *State v. Marcotte*, 2020 WI App 28, ¶16, 392 Wis. 2d 183, 943 N.W.2d 911.

¶68    A judge can be objectively biased or subjectively biased. *Goodson*, 320 Wis. 2d 166, ¶8. Here, Robinson argues that the circuit court was objectively

biased. Objective bias "can exist in two situations": where there are objective facts demonstrating bias and where there is the appearance of bias. *Id.*, ¶9. Robinson argues that here there was an appearance of bias.

¶69 "[T]he appearance of bias offends constitutional due process principles whenever a reasonable person—taking into consideration human psychological tendencies and weaknesses—concludes that the average judge could not be trusted to 'hold the balance nice, clear and true' under all the circumstances." *State v. Gudgeon*, 2006 WI App 143, ¶24, 295 Wis. 2d 189, 720 N.W.2d 114. In other words, "[w]hen the appearance of bias reveals a great risk of actual bias, the presumption of impartiality is rebutted, and a due process violation occurs." *State v. Herrmann*, 2015 WI 84, ¶46, 364 Wis. 2d 336, 867 N.W.2d 772. "[C]omments indicating a circuit court has prejudged a defendant's sentence can give rise to objective bias." *Marcotte*, 392 Wis. 2d 183, ¶20.

¶70 We conclude that Robinson has not rebutted the presumption of impartiality because, contrary to Robinson's argument, a reasonable person would not conclude, based on the circuit court's comments, that the court had prejudged Robinson's sentence or decided to impose a lengthy sentence. In making these comments to Carter, the court never referred, directly or indirectly, to the length or nature of Robinson's sentence. Instead, the court's statements, consistent with what the court explained at the postconviction hearing, reflect that the court believed that Carter would benefit from being present at Robinson's sentencing because Robinson was an example of someone who was older than Carter, who had worked hard and succeeded after initially building up a criminal record when he was younger, but who then reverted to making the types of choices that Carter had made, and because Carter would see the "bumpy road" that resulted from these decisions. The court's statements do not indicate that the court had

prejudged a particular type or length of sentence, or had made up its mind to issue a "lengthy sentence."

¶71 Thus, this case stands in stark contrast to cases in which we have concluded that the defendant's sentence had been prejudged. *See Goodson*, 320 Wis. 2d 166, ¶¶12-13 (concluding that the appearance of bias arose when "the court unequivocally promised to sentence [the defendant] to the maximum period of time if he violated his supervision rules" because "[a] reasonable person would conclude that … the judge had made up his mind about [the defendant's] sentence before the reconfinement hearing"); *Gudgeon*, 295 Wis. 2d 189, ¶26 (concluding that the appearance of bias arose when the court, before a probation-extension hearing, wrote, on a submission from the probation agent, "I want [the defendant's] probation extended"); *Marcotte*, 392 Wis. 2d 183, ¶24 (concluding that the appearance of bias arose when the sentencing judge had also presided over the drug court in which the defendant participated and made comments "indicating that [the defendant] would receive a prison sentence if he did not succeed in drug court"); *State v. Lamb*, No. 2017AP1430-CR, unpublished slip op. (WI App Sep. 25, 2018) (concluding that the appearance of bias arose when the court, which was aware that the parties intended to recommend probation, made statements, prior to the parties' sentencing arguments, indicating that the court did not intend to follow their joint recommendation).[15] Robinson does not identify, nor has our independent research revealed, any cases in which the appearance of bias was deemed to have arisen from facts analogous to those here.

---

[15] Pursuant to WIS. STAT. RULE 809.23(3)(b), authored, unpublished opinions issued after July 1, 2009, may be cited for their persuasive value.

¶72    Based on the foregoing, we conclude that Robinson has not met his burden of rebutting the presumption that the circuit court acted fairly, impartially, and without bias at sentencing.

*VI. Discretionary reversal*

¶73    Finally, Robinson argues that we should exercise our discretion and reverse pursuant to WIS. STAT. § 752.35, which states in relevant part: "In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from[.]" "[R]eversals under WIS. STAT. § 752.35 are rare and reserved for exceptional cases." *State v. Kucharski*, 2015 WI 64, ¶41, 363 Wis. 2d 658, 866 N.W.2d 697. In support of his request for discretionary reversal, Robinson relies on the other arguments that he makes, and he argues that the "cumulative effect" of these argued errors justifies a new trial. However, we have already rejected these individual arguments; accordingly, we reject Robinson's argument that, taken together, they justify discretionary reversal.

**CONCLUSION**

¶74    For all of the reasons stated, we affirm.

*By the Court.*—Judgments and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.